# AMOCO PRODUCTION CO. ET AL. *v.* VILLAGE OF GAMBELL ET AL.

No. 85–1239.   Argued January 12, 1987—Decided March 24, 1987*

---

*Together with No. 85–1406, *Hodel, Secretary of the Interior, et al.* v. *Village of Gambell et al.*, also on certiorari to the same court.

WHITE, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BRENNAN, MARSHALL, BLACKMUN, POWELL, and O'CONNOR, JJ., joined, and in Parts I and III of which STEVENS and SCALIA, JJ., joined. STEVENS, J., filed an opinion concurring in part and concurring in the judgment, in which SCALIA, J., joined, *post*, p. 555.

*Assistant Attorney General Habicht* argued the cause for petitioners in No. 85–1406. With him on the briefs were *Solicitor General Fried, Deputy Solicitor General Wallace, Richard J. Lazarus, Anne S. Almy, Jacques B. Gelin, David C. Shilton,* and *Ralph W. Tarr. E. Edward Bruce* argued the cause for petitioners in No. 85–1239. With him on the briefs were *Brice M. Clagett, Bobby R. Burchfield,* and *Carl J. D. Bauman.*

*Donald S. Cooper* argued the cause for respondents. With him on the brief was *Carol H. Daniel.*†

†*Alvin J. Ziontz* filed a brief for North Slope Borough et al. as *amici curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the State of Alaska by *Harold M. Brown,* Attorney General, and *Deborah Vogt,* Assistant Attorney General; for the State of California *ex rel.* Van de Kamp et al. by *John K. Van de Kamp,* Attorney General of California, *Theodora Berger,* Assistant Attorney General, *Ken Alex,* Deputy Attorney General, *Fred Silverman,* Solicitor of Delaware, *Jim Smith,* Attorney General of Florida, *Corinne K. A. Watanabe,* Attorney General of Hawaii, *Robert T.*

JUSTICE WHITE delivered the opinion of the Court.

Petitioner Secretary of the Interior granted oil and gas leases to petitioner oil companies in the Norton Sound (Lease Sale 57) and Navarin Basin (Lease Sale 83) areas of the Bering Sea under the Outer Continental Shelf Lands Act (OCSLA), 67 Stat. 462, as amended, 43 U. S. C. § 1331 *et seq.* (1982 ed. and Supp. III). The Court of Appeals for the Ninth Circuit directed the entry of a preliminary injunction against all activity in connection with the leases because it concluded that it was likely that the Secretary had failed to comply with § 810 of the Alaska National Interest Lands Conservation Act (ANILCA), 94 Stat. 2371, 16 U. S. C. § 3120, prior to issuing the leases. We granted certiorari, 476 U. S. 1157, and we now reverse.[1]

---

*Stephan*, Attorney General of Kansas, *Paul Bardacke*, Attorney General of New Mexico, *Michael C. Turpen*, Attorney General of Oklahoma, *T. Travis Medlock*, Attorney General of South Carolina, *Jim Mattox*, Attorney General of Texas, *Mary Sue Terry*, Attorney General of Virginia, and *Bronson C. La Follette*, Attorney General of Wisconsin; and for the Natural Resources Defense Council et al. by *Larry Silver* and *Michael Axline*.

*Ronald A. Zumbrun* and *Robin L. Rivett* filed a brief for the Resource Development Council for Alaska, Inc., et al. as *amici curiae*.

[1] The oil company lessees and the Secretary of the Interior separately petitioned for certiorari, Nos. 85–1239 and 85–1406 respectively, presenting the same four questions: (1) whether the Ninth Circuit's rule that a district court must enter a preliminary injunction whenever it finds a likely violation of an environmental statute, absent extraordinary circumstances, conflicts with *Weinberger* v. *Romero-Barcelo*, 456 U. S. 305 (1982); (2) whether ANILCA § 810 applies to the Outer Continental Shelf; (3) whether the Ninth Circuit's ruling that the Secretary of the Interior must fully comply with § 810's requirements prior to leasing and exploration, when a significant restriction of subsistence uses is not expected until the development and production stage, conflicts with *Secretary of Interior* v. *California*, 464 U. S. 312 (1984); and (4) whether the Ninth Circuit's decision applying ANILCA to the OCS should be given retroactive effect. Our answer to the second question disposes of the third and fourth questions. Respondent Alaska Natives cross-petitioned, No. 85–1608, from the Court of Appeals' ruling that the Alaska Native Claims Settlement Act, 43

# I

When the Secretary of the Interior proposed Outer Continental Shelf (OCS) Lease Sale 57, the Alaska Native villages of Gambell and Stebbins sought to enjoin him from proceeding with the sale, claiming that it would adversely affect their aboriginal rights to hunt and fish on the OCS and that the Secretary had failed to comply with ANILCA § 810(a), 16 U. S. C. § 3120(a), which provides protection for natural resources used for subsistence in Alaska.[2] The District Court denied their motion for a preliminary injunction and thereafter granted summary judgment in favor of the Secretary and oil company intervenors, holding that the villagers had

---

U. S. C. § 1601 *et seq.* (1982 ed. and Supp. III), extinguished their aboriginal rights on the OCS. The cross-petition has been held pending our disposition in Nos. 85–1239 and 85–1406.

[2] Section 810(a), 16 U. S. C. § 3120(a), provides:

"In determining whether to withdraw, reserve, lease, or otherwise permit the use, occupancy, or disposition of public lands under any provision of law authorizing such actions, the head of the Federal agency having primary jurisdiction over such lands or his designee shall evaluate the effect of such use, occupancy, or disposition on subsistence uses and needs, the availability of other lands for the purposes sought to be achieved, and other alternatives which would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes. No such withdrawal, reservation, lease, permit, or other use, occupancy or disposition of such lands which would significantly restrict subsistence uses shall be effected until the head of such Federal agency—

"(1) gives notice to the appropriate State agency and the appropriate local committees and regional councils established pursuant to section 3115 of this title;

"(2) gives notice of, and holds, a hearing in the vicinity of the area involved; and

"(3) determines that (A) such a significant restriction of subsistence uses is necessary, consistent with sound management principles for the utilization of the public lands, (B) the proposed activity will involve the minimal amount of public lands necessary to accomplish the purposes of such use, occupancy or other disposition, and (C) reasonable steps will be taken to minimize adverse impacts upon subsistence uses and resources resulting from such actions."

no aboriginal rights on the OCS and that ANILCA did not apply to the OCS.[3]

The Court of Appeals for the Ninth Circuit affirmed the District Court's ruling on aboriginal rights, although on different grounds, and reversed the ruling on the scope of ANILCA § 810. *People of Gambell* v. *Clark*, 746 F. 2d 572 (1984) *(Gambell I)*. With respect to the claim of aboriginal rights, the court assumed without deciding that the villagers once had aboriginal rights to hunt and fish in the Norton Sound,[4] but concluded that these rights had been extinguished by § 4(b) of the Alaska Native Claims Settlement Act (ANCSA), 85 Stat. 690, 43 U. S. C. § 1603(b). That section provides:

> "All aboriginal titles, if any, and claims of aboriginal title *in Alaska* based on use and occupancy, including submerged land underneath all water areas, both inland and offshore, and including any aboriginal hunting or fishing rights that may exist, are hereby extinguished." (Emphasis added.)

The Court of Appeals construed the phrase "in Alaska" to mean "the geographic region, including the contiguous continental shelf and the waters above it, and not merely the area within the strict legal boundaries of the State of Alaska."

---

[3] The villages appealed and moved to enjoin the issuance of the leases pending appeal. The Ninth Circuit denied the motion and on May 10, 1983, 59 tracts were leased for bonus payments totaling over $300 million. While the appeal was pending, the Secretary approved exploration plans submitted by the lessees under 43 U. S. C. § 1340 (1982 ed. and Supp. III) and they proceeded with exploration during the summer of 1984. The Secretary also proceeded with Lease Sale 83 on April 17, 1984, which resulted in the leasing of 163 tracts for total bonus payments of over $500 million.

[4] As explained by the Ninth Circuit, "[a]boriginal title or right is a right of exclusive use and occupancy held by Natives in lands and waters used by them and their ancestors prior to the assertion of sovereignty over such areas by the United States." 746 F. 2d, at 574. See *Oneida Indian Nation* v. *County of Oneida*, 414 U. S. 661, 667–669 (1974); see also F. Cohen, Handbook of Federal Indian Law 486–493 (1982).

746 F. 2d, at 575. Finding the phrase ambiguous, the court examined the legislative history and concluded that Congress wrote the extinguishment provision broadly "to accomplish a complete and final settlement of aboriginal claims and avoid further litigation of such claims." *Ibid.* The court then concluded that ANILCA § 810 had the same geographical scope as ANCSA § 4(b):

> "[The villages] make a compelling argument that the provisions of Title VIII of [ANILCA] protecting subsistence uses were intended to have the same territorial scope as provisions of the earlier Claims Settlement Act extinguishing Native hunting and fishing rights. The two statutory provisions are clearly related. When Congress adopted the Claims Settlement Act it was aware that extinguishing Native rights might threaten subsistence hunting and fishing by Alaska Natives. . . . It is a reasonable assumption that Congress intended the preference and procedural protections for subsistence uses mandated by Title VIII of [ANILCA] to be co-extensive with the extinguishment of aboriginal rights that made those measures necessary." 746 F. 2d, at 579–580.

The court found support for this view in ANILCA's legislative history. But, according to the Court of Appeals, "[t]he most compelling reason for resolving the ambiguous language of Title VIII in favor of coverage of outer continental shelf lands and waters is that Title VIII was adopted to benefit the Natives." *Id.*, at 581. The court acknowledged the familiar rule of statutory construction that doubtful expressions must be resolved in favor of Indians. See *Alaska Pacific Fisheries* v. *United States*, 248 U. S. 78, 89 (1918). It then remanded to the District Court the questions whether the Secretary had substantially complied with ANILCA § 810 in the

course of complying with other environmental statutes,[5] and if not, whether the leases should be voided.

In compliance with the Court of Appeals' decision, the Secretary prepared a postsale evaluation of possible impacts on subsistence uses from Lease Sale 57.[6]   The Secretary found

---

[5] The Coastal Zone Management Act, 16 U. S. C. § 1451 *et seq.* (1982 ed. and Supp. III), Marine Protection, Research, and Sanctuaries Act, 16 U. S. C. § 1431 *et seq.* (1982 ed. and Supp. III), Marine Mammal Protection Act, 16 U. S. C. § 1361 *et seq.* (1982 ed. and Supp. III), Fishery Conservation and Management Act, 16 U. S. C. § 1801 *et seq.* (1982 ed. and Supp. III), Endangered Species Act, 16 U. S. C. § 1531 *et seq.* (1982 ed. and Supp. III), and National Environmental Policy Act, 42 U. S. C. § 4331 *et seq.* (1982 ed. and Supp. III), all apply to activities on the OCS.   Pursuant to the National Environmental Policy Act (NEPA), the Department of the Interior drafted in 1982 a 332-page Final Environmental Impact Statement (EIS) on proposed Lease Sale 57.   Interior analyzed in the EIS the effects that the lease sale, and subsequent exploration, development, and production, could conceivably have on "subsistence uses," as defined by ANILCA § 803, 16 U. S. C. § 3113.   The EIS documented the fish and shellfish, sea mammal, bird, and land animal resources utilized by the villages in the region, including Gambell and Stebbins, and analyzed the sensitivity of these resources to oilspills, other exploration and development impacts, and harvest pressure.   EIS 47–53, 136–148.   The EIS also considered the sociocultural impact of changes in the availability of subsistence resources.   Interior concluded as follows:

"While some changes in local subsistence use and take may occur with this proposal, the probability of significant disturbance, in the form of long-term reduction of subsistence take, large-scale disruption of subsistence harvesting activities, or significant reductions in primary resources utilized for subsistence is unlikely for the region as a whole.   For Savoonga, and to a lesser extent other 'big sea mammal hunting' villages (Diomede, Gambell, King Island, Wales) due to a relatively greater vulnerability to oilspill events, the short-term disturbance is more likely, particularly during the peak development period."   EIS 142.

A comparable EIS was drafted in 1983 for Lease Sale 83.   The Secretary had also previously prepared an EIS in conjunction with his Five Year Leasing Plan.

[6] As we explained in *Secretary of Interior* v. *California,* 464 U. S., at 337, there are four distinct statutory stages to developing an oil well on the OCS: "(1) formulation of a 5-year leasing plan by the Department of the Interior; (2) lease sales; (3) exploration by the lessees; (4) development and

that the execution of the leases, which permitted lessees to conduct only limited preliminary activities on the OCS, had not and would not significantly restrict subsistence uses. He further found that the exploration stage activities, including seismic activities and exploratory drilling, that had occurred in Norton Sound had not significantly restricted subsistence uses and were not likely to do so in the future. Finally, he found that, if development and production activities were ever conducted, which was not likely, they might, in the event of a major oilspill, significantly restrict subsistence uses for limited periods in limited areas.[7]

In April 1985, the villages sought a preliminary injunction in the District Court against exploratory activities in Norton Sound. At the same time, the village of Gambell, joined by Nunam Kitlutsisti, an organization of Yukon Delta Natives, filed a complaint seeking to void Lease Sale 83 and to enjoin imminent exploratory drilling in the Navarin Basin. The District Court consolidated the motions for preliminary injunctions and denied them. It found that respondents had established a strong likelihood of success on the merits. Although the Secretary, in the EIS's for the Five Year Leasing Plan and for the Norton Sound and Navarin Basin Lease Sales, had evaluated in some detail the effect of OCS oil and

---

production. Each stage involves separate regulatory review that may, but need not, conclude in the transfer to lease purchasers of rights to conduct additional activities on the OCS." The Secretary examined the effects on subsistence uses of Lease Sale 57 itself, present and future exploratory activities, and development and production activities, which the Secretary estimated had a 13% probability of being undertaken. App. to Pet. for Cert. in No. 85–1406, pp. 81a–106a. The Secretary stressed that a definite evaluation with respect to the latter stage could only be made if and when plans for development and production were submitted and that a separate § 810 evaluation would be prepared at that time. The Secretary relied to a considerable degree on the 1982 Final EIS.

[7] The Secretary approved exploration plans for the Navarin Basin after the decision in *Gambell I* and accordingly made explicit ANILCA evaluations. See App. to Pet. for Cert. in No. 85–1406, pp. 107a–115a. The lessees planned exploration activities for the summer of 1985.

gas development on subsistence resources and had considered alternatives which would reduce or eliminate the impact on these resources, the Secretary failed to comply with ANILCA because "he did not have the policy precepts of ANILCA in mind at the time of evaluation." App. to Pet. for Cert. in No. 85–1239, pp. 57a–58a. And with respect to the postsale evaluation for Lease Sale 57, the District Court concluded that because development and production activities, if they ever occurred, could significantly restrict subsistence uses in certain areas, the Secretary was required to conduct the hearing and make the findings required by §§ 810(a)(1)–(3) prior to conducting the lease sale. Nevertheless, the court concluded that injunctive relief was not appropriate based on the following findings:

"(1) That delay in the exploration of the OCS may cause irreparable harm to this nation's quest for new oil resources and energy independence. Expedited exploration as a policy is stated in OCSLA. See 43 U. S. C. § 1332(3);

"(2) That exploration will not significantly restrict subsistence resources; and

"(3) That the Secretary continues to possess power to control and shape the off-shore leasing process. Therefore, if the ANILCA subsistence studies require alteration of the leasing conditions or configuration the Secretary will be able to remedy any harm caused by the violation." *Id.*, at 62a–63a.

Accordingly, applying the traditional test for a preliminary injunction, the court concluded that the balance of irreparable harm did not favor the movants; in addition, the public interest favored continued oil exploration and such exploration in this case would not cause the type of harm that ANILCA was designed to prevent.

Respondents appealed from the District Court's denial of a preliminary injunction. The Ninth Circuit reversed. *People of Gambell* v. *Hodel*, 774 F. 2d 1414 (1985)

*(Gambell II).* The court, agreeing that the villages had established a strong likelihood of success on the merits, concluded that the District Court had not properly balanced irreparable harm and had not properly evaluated the public interest. Relying on its earlier decision in *Save Our Ecosystems* v. *Clark,* 747 F. 2d 1240, 1250 (1984), the court stated: "'Irreparable damage is presumed when an agency fails to evaluate thoroughly the environmental impact of a proposed action.'" 774 F. 2d, at 1423. It ruled that "injunctive relief is the appropriate remedy for a violation of an environmental statute absent rare or unusual circumstances." *Ibid.* "Unusual circumstances" are those in which an injunction would interfere with a long-term contractual relationship, *Forelaws on Board* v. *Johnson,* 743 F. 2d 677 (CA9 1984), or would result in irreparable harm *to the environment, American Motorcyclist Assn.* v. *Watt,* 714 F. 2d 962, 966 (CA9 1983). 774 F. 2d, at 1423–1425. The court found no such circumstances in the instant case. The Ninth Circuit also concluded that the policy declared in OCSLA to expedite exploration of the OCS had been superseded by ANILCA's policy to preserve the subsistence culture of Alaska Natives. Finally, the court rejected arguments that it was improper to apply *Gambell I* retroactively to Lease Sale 83.

## II

Petitioners assert that the Ninth Circuit erred in directing the grant of a preliminary injunction. We addressed a similar contention in *Weinberger* v. *Romero-Barcelo,* 456 U. S. 305 (1982). The District Court in that case found that the Navy had violated the Federal Water Pollution Control Act (FWPCA), 33 U. S. C. § 1251 *et seq.* (1982 ed. and Supp. III), by discharging ordnance into the sea without a permit. 456 U. S., at 307–308. The court ordered the Navy to apply for a permit but refused to enjoin weapons-training operations during the application process because the Navy's "technical violations" were not causing any "appreciable harm" to the

quality of the water and an injunction would cause grievous harm to the Navy's military preparedness and therefore to the Nation. *Id.*, at 309–310. The First Circuit reversed and directed the District Court to enjoin all Navy activities until it obtained a permit, concluding that the traditional equitable balancing of competing interests was inappropriate where there was an absolute statutory duty to obtain a permit. *Id.*, at 310–311. We reversed, acknowledging at the outset the fundamental principle that an injunction is an equitable remedy that does not issue as of course. *Id.*, at 311. We reviewed the well-established principles governing the award of equitable relief in federal courts. *Id.*, at 311–313. In brief, the bases for injunctive relief are irreparable injury and inadequacy of legal remedies. In each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. Although particular regard should be given to the public interest, "[t]he grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law." *Id.*, at 313. Finally, we stated:

> "Of course, Congress may intervene and guide or control the exercise of the courts' discretion, but we do not lightly assume that Congress has intended to depart from established principles. . . . 'Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied.'" *Ibid.* (quoting *Porter* v. *Warner Holding Co.,* 328 U. S. 395, 398 (1946)).

Applying these principles, we concluded that the purpose of the FWPCA—to restore and maintain the integrity of the Nation's waters—would not be undermined by allowing the statutory violation to continue during the permit application

process because the ordnance was not polluting the water. 456 U. S., at 314–315. The First Circuit had erroneously focused on the integrity of the *permit process* rather than on the integrity of the Nation's waters. Moreover, the permit process was not completely circumvented since the District Court ordered the Navy to apply for a permit. An injunction against all discharges was not the only means of ensuring compliance with the Act[8] and we found nothing in the Act's language and structure or legislative history which suggested that Congress intended to deny courts their traditional equitable discretion.[9]

---

[8] We noted that, in addition to a court order to apply for a permit, the FWPCA could be enforced through fines and criminal penalties, 33 U. S. C. §§ 1319(c) and (d). 456 U. S., at 314. The Ninth Circuit believed that the absence of such enforcement provisions in ANILCA distinguished the FWPCA and *Romero-Barcelo*. 774 F. 2d, at 1426, n. 2. It stated that the injunctive relief it granted was the only means of insuring compliance under § 810. The Court of Appeals was incorrect. Here, as in *Romero-Barcelo*, compliance could be obtained through the simple means of an order to the responsible federal official to comply. The Secretary had not complied with § 810 only because he interpreted ANILCA not to apply to the OCS.

[9] We distinguished *TVA* v. *Hill*, 437 U. S. 153 (1978), in which we had held that Congress, in the Endangered Species Act of 1973, 87 Stat. 884, as amended, 16 U. S. C. § 1531 *et seq.* (1982 ed. and Supp. III), had foreclosed the traditional discretion possessed by an equity court and had required the District Court to enjoin completion of the Tellico Dam in order to preserve the snail darter, an endangered species. That statute contains a flat ban on destruction of critical habitats of endangered species and it was conceded that completion of the dam would destroy the critical habitat of the snail darter. We stated:

"Refusal to enjoin the action would have ignored the 'explicit provisions of the Endangered Species Act.' 437 U. S., at 173. Congress, it appeared to us, had chosen the snail darter over the dam. The purpose and language of the statute [not the bare fact of a statutory violation] limited the remedies available to the District Court; only an injunction could vindicate the objectives of the Act." 456 U. S., at 314.

The Ninth Circuit erroneously relied on *TVA* v. *Hill*. 774 F. 2d, at 1426, n. 2. It is clear that this case is similarly distinguishable from *Hill*.

We see nothing which distinguishes *Romero-Barcelo* from the instant case. The purpose of ANILCA § 810 is to protect Alaskan subsistence resources from unnecessary destruction. Section 810 does not prohibit all federal land use actions which would adversely affect subsistence resources but sets forth a procedure through which such effects must be considered and provides that actions which would significantly restrict subsistence uses can only be undertaken if they are necessary and if the adverse effects are minimized. There is no clear indication in § 810 that Congress intended to deny federal district courts their traditional equitable discretion in enforcing the provision, nor are we compelled to infer such a limitation. Like the First Circuit in *Romero-Barcelo*, the Ninth Circuit erroneously focused on the statutory procedure rather than on the underlying substantive policy the process was designed to effect—preservation of subsistence resources. The District Court's refusal to issue a preliminary injunction against all exploration activities did not undermine this policy. The District Court, after reviewing the EIS's for the Secretary's Five Year Leasing Plan and for Lease Sales 57 and 83, as well as the § 810 study prepared after *Gambell I*, expressly found that exploration activities would not significantly restrict subsistence uses.[10] The Court of Appeals did not conclude that this factual finding was clearly erroneous. The District Court also found that "the Secretary continues to possess power to control and shape the off-shore leasing process," App. to Pet. for Cert. in No. 85–1239, p. 63a, referring to the four distinct stages under OCSLA, particularly the requirement for secretarial approval of a development and production plan, 43 U. S. C. § 1351. See n. 6, *supra*. The Court of Appeals did not dispute that the Secretary could meaningfully comply with ANILCA § 810 in conjunction with his review of production and development plans. Instead, the court stated that "[i]rreparable damage

---

[10] Implicit in this finding was the finding that the lease-sale stage had not significantly restricted subsistence uses.

is *presumed* when an agency fails to evaluate thoroughly the environmental impact of a proposed action." 774 F. 2d, at 1423 (emphasis added). This presumption is contrary to traditional equitable principles and has no basis in ANILCA. Moreover, the environment can be fully protected without this presumption. Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i. e.*, irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment. Here, however, injury to subsistence resources from exploration was not at all probable. And on the other side of the balance of harms was the fact that the oil company petitioners had committed approximately $70 million to exploration to be conducted during the summer of 1985 which they would have lost without chance of recovery had exploration been enjoined. *Id.*, at 1430.

We acknowledged in *Romero-Barcelo* the important role of the "public interest" in the exercise of equitable discretion. The District Court concluded that the public interest in this case favored continued oil exploration, given OCSLA's stated policy[11] and the fact that "such exploration will not cause the type of harm, a restriction in subsistence uses or resources, that ANILCA was designed to prevent." App. to Pet. for Cert. in No. 85–1239, p. 63a. The Court of Appeals concluded, however, that the public interest favored injunctive relief because the interests served by federal environmental statutes, such as ANILCA, supersede all other interests that might be at stake. We do not read ANILCA to have repealed OCSLA. Congress clearly did not state in ANILCA

---

[11] OCSLA declares it to be the policy of the United States that "the outer Continental Shelf is a vital national resource reserve held by the Federal Government for the public, which should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs." 43 U. S. C. § 1332(3).

that subsistence uses are always more important than development of energy resources, or other uses of federal lands; rather, it expressly declared that preservation of subsistence resources is *a* public interest and established a framework for reconciliation, where possible, of competing public interests.[12]

Accordingly, the Ninth Circuit erred in directing the issuance of a preliminary injunction.

### III

Petitioners also contend that the Court of Appeals erred in holding that ANILCA § 810 applies to the OCS. We agree. By its plain language, that provision imposes obligations on federal agencies with respect to decisions affecting use of federal lands *within the boundaries of the State of Alaska*. Section 810 applies to "public lands." Section 102 of ANILCA, 16 U. S. C. § 3102, defines "public lands," and included terms, for purposes of the Act[13] as follows:

"(1) The term 'land' means lands, waters, and interests therein.

---

[12] Finally, the Ninth Circuit distinguished *Romero-Barcelo* on the ground that the District Court in that case refused to issue a permanent injunction after a trial on the merits whereas in this case the District Court denied preliminary injunctive relief. We fail to grasp the significance of this distinction. The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success. See, *e. g., University of Texas* v. *Camenisch,* 451 U. S. 390, 392 (1981). Despite the preliminary nature of the proceeding, the record before the District Court was complete enough to allow it to decide that exploration activities would not significantly restrict subsistence resources. The fact that, on another record, such a conclusion could not be made with any degree of confidence is a factor to be considered under the traditional equitable balancing of interests but hardly suggests that the balancing test itself must be abandoned.

[13] Section 102 provides that the definitions apply to the entire Act, except that in Title IX, which provides for implementation of ANCSA and the Alaska Statehood Act, 72 Stat. 339, and in Title XIV, which amends ANCSA and related provisions, the terms shall have the same meaning as they have in ANCSA and the Alaska Statehood Act.

"(2) The term 'Federal land' means lands the title to which is in the United States after December 2, 1980.

"(3) The term 'public lands' means land situated *in Alaska* which, after December 2, 1980, are Federal lands, except [land selected by the State of Alaska or granted to the State under the Alaska Statehood Act, 72 Stat. 339, or any other provision of federal law, land selected by a Native Corporation under ANCSA, and lands referred to in ANCSA § 19(b), 43 U. S. C. § 1618(b)]." (Emphasis added.)

The phrase "in Alaska" has a precise geographic/political meaning. The boundaries of the State of Alaska can be delineated with exactitude. The State of Alaska was "admitted into the Union on an equal footing with the other States," and its boundaries were defined as "all the territory, together with the territorial waters appurtenant thereto, now included in the Territory of Alaska." Alaska Statehood Act (Statehood Act) §§ 1, 2, 72 Stat. 339. The Submerged Lands Act of 1953, 67 Stat. 29, as amended, 43 U. S. C. § 1301 *et seq.* (1982 ed. and Supp. III), was made applicable to the State. Statehood Act § 6(m), 72 Stat. 343. Under § 4 of the Submerged Lands Act, 43 U. S. C. § 1312, the seaward boundary of a coastal State extends to a line three miles from its coastline. At that line, the OCS commences. OCSLA § 2(a), 43 U. S. C. § 1331(a). By definition, the OCS is not situated in the State of Alaska. Nevertheless, the Ninth Circuit concluded that "in Alaska" should be construed in a general, "nontechnical" sense to mean the geographic region of Alaska, including the Outer Continental Shelf.[14]   746 F. 2d,

---

[14] The Ninth Circuit stated: "In strikingly similar circumstances, the Supreme Court has twice given an expansive and non-technical interpretation to geographical terms to achieve Congress's apparent purpose to protect native fisheries. *Hynes* v. *Grimes Packing Co.*, 337 U. S. 86, 110–116 . . . (1949); *Alaska Pacific Fisheries* v. *United States*, 248 U. S. 78, 89 . . . (1918)." 746 F. 2d, at 580. The question in *Alaska Pacific Fisheries* was the geographic scope of "the body of lands known as Annette

at 579.   We reject the notion that Congress was merely waving its hand in the general direction of northwest North America when it defined the scope of ANILCA as "Federal lands" "situated in Alaska."   Although language seldom attains the precision of a mathematical symbol, where an expression is capable of precise definition, we will give effect to that meaning absent strong evidence that Congress actually intended another meaning.   "[D]eference to the supremacy of the Legislature, as well as recognition that Congressmen typically vote on the language of a bill, generally requires us to assume that 'the legislative purpose is expressed by the ordinary meaning of the words used.'"   *United States* v. *Locke*, 471 U. S. 84, 95 (1985) (quoting *Richards* v. *United States*, 369 U. S. 1, 9 (1962)).   This is not that "exceptional case" where acceptance of the plain meaning of a word would "thwart the obvious purpose of the statute."   *Griffin* v. *Oceanic Contractors, Inc.*, 458 U. S. 564, 571 (1982) (internal quotations omitted).[15]

---

Islands," the reservation of the Metlakahtla Indians, in particular: whether the reservation embraced only the uplands or included the intervening and surrounding waters.   Similarly, the issue in *Hynes* was whether the phrase "any other public lands which are actually occupied by Indians or Eskimos within said Territory" authorized the Secretary of the Interior to include in the Karluk Reservation the waters to a distance of 3,000 feet from the shore.   337 U. S., at 91, 92.   In both cases, we concluded that, in light of the purposes of the reservations, the phrases were properly interpreted to include a band of adjacent waters.   These cases clearly are inapposite.   Unlike "Alaska," the phrases in issue did not have precise geographic/political meanings which would have been commonly understood, without further inquiry, to exclude the waters.   There is no plain meaning to "the body of lands" of an island group, 248 U. S., at 89, and clearly none to "public lands which are actually occupied by Indians or Eskimos."   The meaning of the phrases had to be derived from their context in the statutes.

[15] Petitioners also assert that the OCS plainly is not "Federal land" because the United States does not claim "title" to the OCS.   See ANILCA § 102(2), 16 U. S. C. § 3102(2).   The United States may not hold "title" to the submerged lands of the OCS, but we hesitate to conclude that the United States does not have "title" to any "interests therein."   Certainly,

Nothing in the language or structure of ANILCA compels the conclusion that "in Alaska" means something other than "in the State of Alaska." The subsistence-protection provisions of the statute must be viewed in the context of the Act as a whole.[16] ANILCA's primary purpose was to complete the allocation of federal lands in the State of Alaska,[17] a process begun with the Statehood Act in 1958 and continued in 1971 in ANCSA.[18] To this end, it provided for additions to

it is not clear that Congress intended to exclude the OCS by defining public lands as "lands, waters, and interests therein" "the title to which is in the United States." We also reject the assertion that the phrase "public lands," in and of itself, has a precise meaning, without reference to a definitional section or its context in a statute. See *Hynes* v. *Grimes Packing Co.*, 337 U. S., at 114–116.

[16] ANILCA is comprised of 15 titles and spans 181 pages of the Statutes at Large, 94 Stat. 2371–2551. The subsistence protection provisions are contained in Title VIII. 94 Stat. 2422–2430, 16 U. S. C. §§ 3111–3126.

[17] Congress clearly articulated this purpose:

"(a) In order to preserve for the benefit, use, education, and inspiration of present and future generations certain lands and waters in the *State of Alaska* that contain nationally significant natural, scenic, historic, archeological, geological, scientific, wilderness, cultural, recreational, and wildlife values, the units described in the following titles are hereby established.

.      .      .      .      .

"(d) This Act provides sufficient protection for the national interest in the scenic, natural, cultural and environmental values on the public lands in Alaska, and at the same time provides adequate opportunity for satisfaction of the economic and social needs of the *State of Alaska* and its people; accordingly, the designation and disposition of the public lands in Alaska pursuant to this Act are found to represent a proper balance between the reservation of national conservation system units and those public lands necessary and appropriate for more intensive use and disposition, *and thus Congress believes that the need for future legislation designating new conservation system units, new national conservation areas, or new national recreation areas, has been obviated thereby.*" ANILCA § 101, 16 U. S. C. § 3101 (emphasis added).

[18] The House Report declared the following to be the purpose of the bill:

"The principal purpose of H. R. 39 is [sic] amended and reported by the Committee on Interior and Insular Affairs is to designate approximately 120 million acres of Federal land in Alaska for protection of their resource

the National Park System, National Wildlife Refuge System, National Forest System, National Wild and Scenic Rivers System, and National Wilderness Preservation System, and also provided for the establishment of a National Conservation Area and National Recreation Area, within the State of Alaska. Titles II–VII, 94 Stat. 2377–2422. The Act also provided means to facilitate and expedite the conveyance of federal lands within the State to the State of Alaska under the Statehood Act and to Alaska Natives under ANCSA. Titles IX and XIV, 94 Stat. 2430–2448, 2491–2549. The remaining federal lands within the State were left available for resource development and disposition under the public land laws. The other provisions of ANILCA have no express applicability to the OCS and need not be extended beyond the State of Alaska in order to effectuate their apparent purposes.[19] It is difficult to believe that Congress intended the subsistence protection provisions of Title VIII, alone among all the provisions in the Act, to apply to the OCS. It is particularly implausible because the same definition of "public lands" which defines the scope of Title VIII applies as well to

_____

values under permanent Federal ownership and management. . . . It virtually completes the public land allocation process in Alaska which began with the Statehood Act of 1958 which granted the State the right to select approximately 104 million acres of public land; this land grant is less than 30 percent complete. The Federal land disposal process was continued by the Alaska Native Claims Settlement Act of 1971 which granted Alaska Natives the right to select approximately 44 million acres of federal land; this process is only one-eighth complete." H. R. Rep. No. 96–97, pt. 1, p. 135 (1979).

See also H. R. Rep. No. 96–97, pt. 2, p. 89 (1979); S. Rep. No. 96–413, p. 126 (1979).

[19] Title I sets forth the Act's purposes and definitions. Titles X and XV pertain to mineral resources. Title XI governs transportation and utility systems in and across, and access into, conservation system units, Title XII provides for federal-state cooperation, and Title XIII contains miscellaneous administrative provisions.

the rest of the statute (with the exceptions noted at n. 13, *supra*).

There is a lone reference to the OCS in the statute, in § 1001(a), 16 U. S. C. § 3141(a), and it is for the purpose of ensuring that the provision does *not* apply to the OCS.[20] Section 1001 provides for a study of oil and gas resources, wilderness characteristics, and wildlife resources of the "North Slope":

> "(a) The Secretary shall initiate and carry out a study of all Federal lands (other than submerged lands on the Outer Continental Shelf) in Alaska north of 68 degrees north latitude and east of the western boundary of the National Petroleum Reserve—Alaska, other than lands included in the National Petroleum Reserve—Alaska and in conservation system units established by this Act."

The Secretary suggests that Congress included the parenthetical excluding the OCS out of an abundance of caution because "North Slope" is defined in a related statute—the Alaska Natural Gas Transportation Act of 1976, 15 U. S. C. § 719 *et seq.* (1982 ed. and Supp. III)—to include the OCS. See 15 U. S. C. § 719b. Whatever the reason for caution, it is apparent from ANILCA § 1008(a), 16 U. S. C. § 3148(a), that Congress did not intend "Federal lands in Alaska" to include the OCS despite the parenthetical in § 1001(a). Section 1008(a) requires the Secretary to "establish, pursuant to the Mineral [Lands] Leasing Act of 1920, as amended [30 U. S. C. § 181 *et seq.* (1982 ed. and Supp. III)], an oil and gas leasing program *on the Federal lands of Alaska* not subject to the study required by section 1001 of this Act, other than lands included in the National Petroleum Reserve—Alaska."

---

[20] The Ninth Circuit relied on this provision in support of its conclusion that the phrase "in Alaska" is ambiguous and can be read to include the OCS. See 746 F. 2d, at 575.

(Emphasis added.) Congress clearly did not intend this program to extend to the OCS; OCSLA, rather than the Mineral Lands Leasing Act, governs mineral leasing on the OCS. See 43 U. S. C. § 1333(a)(1).

Title VIII itself suggests that it does not apply to the OCS. Section 810 places the duty to perform a subsistence evaluation on "the head of the Federal agency having primary jurisdiction over such lands." Unlike onshore lands, no federal agency has "primary jurisdiction" over the OCS; agency jurisdiction turns on the particular activity at issue. See G. Coggins & C. Wilkinson, Federal Public Land and Resources Law 434 (1981).

The similarity between the language of ANILCA and its predecessor statutes, the Statehood Act and ANCSA, also refutes the contention that Congress intended "Alaska" to include the OCS. In the Statehood Act, Congress provided that the State of Alaska could select over 100 million acres from the vacant and unreserved "public lands of the United States in Alaska" within 25 years of its admission. Statehood Act § 6(b), 72 Stat. 340. Similarly, in ANCSA, Congress allowed Native Alaskans to select approximately 40 million acres of "Federal lands and interests therein located in Alaska," with the exception of federal installations and land selections of the State of Alaska under the Statehood Act. 43 U. S. C. §§ 1602(e), 1610(a), 1611. We agree with the Secretary that "[i]t is inconceivable that Congress intended to allow either the State of Alaska or Native Alaskans to select portions of the OCS—'a vital national resource reserve held by the [government] for the public' (43 U. S. C. 1332(3))." Brief for Petitioners in No. 85–1406, p. 33. Clearly, the purpose of these provisions was to apportion the land within the boundaries of the State of Alaska. The nearly identical language in ANILCA strongly suggests a similar scope for that statute.

When statutory language is plain, and nothing in the Act's structure or relationship to other statutes calls into question

this plain meaning, that is ordinarily "the end of the matter." *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842 (1984). "Going behind the plain language of a statute in search of a possibly contrary congressional intent is a step to be taken cautiously even under the best of circumstances." *United States* v. *Locke*, 471 U. S., at 95–96 (internal quotations omitted). ANILCA's legislative history does not evidence a congressional intent contrary to our reading of the statutory language. Significantly, the legislative history nowhere expressly indicates that the subsistence provisions apply to the OCS. The Ninth Circuit relied on a number of remarks made during the floor debates which were not specifically addressed to the scope of ANILCA in general or the subsistence provisions in particular. 746 F. 2d, at 579. The central issue of the floor debates was the appropriate balance between exploitation of natural resources, particularly energy resources, and dedication of land to conservation units. A number of Congressmen addressed the amount of oil expected to be recovered from the OCS offshore of Alaska in the context of this balancing and, in doing so, referred to "Alaska" in a manner which included the OCS. Representative Udall, Chairman of the House Committee on Interior and Insular Affairs, and floor manager of the bill, for example, sought to assure Members that the bill he favored did not inordinately restrict energy development:

> "The experts tell us that most of the oil and gas is not going to be from onshore. . . . Offshore *in Alaska* there are 203 million acres of sedimentary basin. Let me tell the Members how much of that is put out of production by this bill so that they cannot get it. The answer is zero. Every single acre of offshore oil sedimentary basin potential in Alaska is going to be open for oil drilling and prospecting. The State owns some of it beneath the high water mark, and the Federal Government owns the rest.

"Under other legislation those submerged lands are open, are going to be explored and developed, and that should be 203 million acres." 125 Cong. Rec. 9900 (1979) (emphasis added); see also *id.*, at 11128.

This casual use of the phrase "in Alaska" in a floor debate does not carry the same weight that it does in the definitional section of the statute.[21] Spoken language is ordinarily less precise than written language; Representative Udall could easily have intended to say "offshore *of* Alaska." Indeed, the obvious thrust of his statement was that ANILCA does *not* apply to the OCS; rather, OCSLA governs offshore oil development. Numerous statements by other legislators reveal a common understanding—consistent with the plain meaning of the statutory language—that ANILCA simply "has nothing to do with the Outer Continental Shelf," *id.*, at 11170 (remarks of Rep. Emery).[22]

---

[21] See also 125 Cong. Rec. 9893 (1979) (remarks of Rep. Vento) ("[The Udall-Anderson bill] provides for the potential exploration and development of approximately 95 percent of the onshore areas which have either high or favorable potential for oil and gas and 100 percent of the offshore potential sites, which . . . comprises two-thirds of Alaska's oil potential"); *id.*, at 9907 (remarks of Rep. Young) ("I will tell the Members this: The person who supports offshore drilling in Alaska first over onshore drilling is doing a great disservice to the environment"); *id.*, at 11174 (remarks of Rep. Huckaby) ("Alaska's offshore oil potential is estimated to be some 16 to 25 billion barrels").

[22] See also 126 Cong. Rec. 21889 (1980) (remarks of Sen. Bayh) ("100 percent of the offshore sites would remain available to exploration"); *id.*, at 21657 (remarks of Sen. Cranston) (same); *id.*, at 18747 (remarks of Sen. Hart) ("[M]ost of Alaska's undiscovered oil and gas lies offshore, and so would not be affected by these land designations"); 125 Cong. Rec. 11450 (1979) (remarks of Rep. Kostmayer) ("Two hundred and five million acres offshore are untouched by the Udall-Anderson bill").

The Ninth Circuit also relied on the fact that ANILCA's subsistence provisions, as finally enacted, cover all federal lands in Alaska and that its saving clause, 16 U. S. C. § 3125, specifies that the subsistence provisions do not affect the Magnuson Fishery Conservation and Management Act (FCMA), 90 Stat. 331, 16 U. S. C. § 1801 *et seq.* (1982 ed. and Supp. III). 746 F. 2d, at 581. Under the FCMA, the United States asserts exclusive

Finally, we reject the Ninth Circuit's reliance on the familiar rule of statutory construction that doubtful expressions must be resolved in favor of Indians. 746 F. 2d, at 581. There is no ambiguity here which requires interpretation. "The canon of construction regarding the resolution of ambiguities . . . does not permit reliance on ambiguities that do not exist; nor does it permit disregard of the clearly expressed intent of Congress." *South Carolina* v. *Catawba Indian Tribe*, 476 U. S. 498, 506 (1986).

The judgment of the Ninth Circuit with respect to the entry of a preliminary injunction and the applicability of ANILCA § 810 to the OCS is reversed. We do not decide here the scope of ANCSA § 4(b). Respondents' cross-petition on this issue, No. 85–1608, is granted, the Court of Appeals' judgment that § 4(b) extinguished aboriginal rights on the OCS is vacated, and this question is remanded to the Court of Appeals for decision in light of this opinion.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE SCALIA joins, concurring in part and concurring in the judgment.

Given the Court's holding that § 810 of the Alaska National Interest Lands Conservation Act (ANILCA), 94 Stat. 2371, 16 U. S. C. § 3120, does not apply to the Outer Continental Shelf, it is unnecessary to decide whether the Court of Appeals applied the proper standard in determining the

---

fishery management authority in the fishery conservation zone which commences at the boundary of the coastal States and extends 200 miles from the coast. 16 U. S. C. §§ 1811, 1812(1). According to the Court of Appeals, the inclusion of the FCMA in the saving clause indicates that ANILCA applies to the OCS. However, the FCMA also applies to "anadromous species throughout the migratory range of each such species beyond the fishery conservation zone," which would include waters within the State of Alaska. 16 U. S. C. § 1812(2). Thus, there is no need to interpret "Alaska" to include the OCS in order to give meaning to the FCMA's inclusion in the saving clause.

availability of injunctive relief.* Accordingly, I join only Parts I and III of the Court's opinion.

---

*Indeed, the Court itself recognizes this when it declines to reach two additional questions that were presented in the petition. See *ante*, at 534–535, n. 1. This is not a case in which discussion of a nonessential issue is arguably appropriate because the lower court is likely to employ the identical legal analysis on remand. Even if, in light of the decisions in this case and the cross-petition, the Court of Appeals finds that respondents retain aboriginal rights in the Outer Continental Shelf, it would apparently not apply the same injunctive relief standard that it applied with relation to ANILCA. The special injunctive standard applied to the ANILCA claim was based on Circuit precedent providing that, absent unusual circumstances, "[a]n injunction is the appropriate remedy for a *substantive procedural violation of an environmental statute." People of Gambell* v. *Hodel,* 774 F. 2d 1414, 1422 (1985) (emphasis added). See generally *Save Our Ecosystems* v. *Clark,* 747 F. 2d 1240, 1250 (CA9 1984). There is no reason to believe that this rule would be extended to injunctions designed to prevent interference with aboriginal rights.