**STATE OF NEW YORK, Plaintiff,**

v.

The **UNITED STATES GENERAL SERVICES ADMINISTRATION and Dennis Fisher, Acting Administrator of the United States General Services Administration, Defendants.**

No. 93–CV–313.

United States District Court,
N.D. New York.

April 5, 1993.

Robert Abrams, Atty. Gen. Dept. of Law, Albany, NY, Jo M. Katz, of counsel, for plaintiff.

Gary L. Sharpe, U.S. Atty. Albany, NY, William C. Pericak, of counsel, U.S. Dept. of Justice, Environment & Natural Resources Div., Gen. Litigation Section, Washington, DC, Caroline M. Zander, Trial Atty., of counsel, for defendants.

## MEMORANDUM DECISION AND ORDER

CHOLAKIS, District Judge.

In this action to vindicate the federal Coastal Zone Management Act (CZMA), 16 U.S.C. § 1451 *et seq.*, plaintiff State of New York seeks a permanent injunction requiring the United States General Services Administration (GSA) and its acting director to provide a "consistency determination" prior to selling a single-family residence on the Hudson River in the Town of Athens, Greene County, New York. The State alleges that the sale of the house constitutes a federal activity affecting the State's coastal zone, and thus triggers the procedural requirements of the CZMA and the State's program implementing that statute. The State brings the present motion for preliminary injunctive relief, pending the resolution of the case on the merits.

### Facts

Pursuant to the federal drug forfeiture statutes, the United States took title to the disputed riverfront residence under Judge McCurn's Default Judgment and Order of Forfeiture, dated September 18, 1990. *See* 21 U.S.C. § 881(a)(6) (forfeiture of, *inter alia,* proceeds of drug activity). Pursuant to Judge McCurn's Order, the U.S. Marshal attempted to sell the parcel. After the Marshal's early attempt to sell the property through a private broker proved fruitless, the Marshal enlisted the aid of the GSA, one of the federal government's property management agencies.

After the GSA advertised the property for sale in a government publication, the State sought from the GSA a formal determination that the sale of the riverfront property was

consistent with the State's Coastal Zone Management Plan.[1] The parties and the regulations refer to this determination as a "consistency determination." *See* 15 C.F.R. § 930.34 (1992).

The GSA responded to several State requests by arguing, in substance, that the sale of the property did not warrant a consistency determination because the property came into federal ownership under the drug forfeiture statutes. Moreover, the GSA argued, the property was not "surplus property" and GSA did not have title to the property. Rather, the agency was serving in the capacity as broker for the U.S. Marshals service, the agency that holds the title. In opposition to the motion for injunctive relief, the U.S. government claims that the State should have sued the U.S. Marshal, not the GSA, because the former owns the property and has the exclusive authority to sell it.

The Office of Ocean and Coastal Resource Management (OCRM), an agency within the Commerce Department, disagreed with the GSA. By letter, the OCRM informed GSA that the sale of the land constitutes an activity that triggers the CZMA and implementing regulations, and urged GSA to "determine whether the sale of federal property in Athens will affect land or water uses or natural resources...." *See* Letter from Trudy Coxe to James A. Peterson, dated Oct. 2, 1992 (found at Exh. J to Aff. of Bryan P. Cullen).

In spite of the requests from the State and the advice from the federal OCRM, GSA refused to make a "consistency determination." In September, 1992, the GSA accepted a bid on the riverfront property. Because of the instant dispute between the State and the GSA, the purchaser of the property and the U.S. Marshal postponed the closing until April, 1993. Through this lawsuit, the State seeks to prevent the closing of that sale and to compel GSA to make a consistency determination.

### Preliminary Injunctive Relief

A familiar standard governs the granting of preliminary injunctive relief. The State, as the party seeking such relief, has the burden of showing

(a) that it will suffer irreparable harm if relief is denied, and (b) either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them fair ground for litigation and a balance of hardships tipping decidedly in plaintiff's favor. *Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 62 (2d Cir.1992).

### 1. *Irreparable Injury*

■ The State says that if the Court permits the GSA to dispose of the property without going through the CZMA process, the State "forever is deprived of its right to enforce the policies of its approved Coastal Management Program, and exercise its authority over the use and development of its coastal zone ..." *See* Memorandum in Support of Preliminary Injunction at 13. The State cites *Amoco Production Co. v. Gambell*, 480 U.S. 531, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987) and *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982) for the proposition that a statutory violation will constitute irreparable harm when it "undermines the underlying substantive policy the statutory scheme was designed to effect." *See* Memorandum in Support of Preliminary Injunction at 13. Neither case, however, stands for the proposition that the violation of an environmental statute constitutes irreparable injury, mandating injunctive relief. Quite to the contrary, the two cases stand for the principle that federal courts, applying traditional equitable principles, are free to grant or withhold injunctive relief as circumstances require. *See Romero–Barcelo*, 456 U.S. at 320, 102 S.Ct. at 1807; *Amoco Production Co.*, 480 U.S. at 541–46, 107 S.Ct. at 1402–05.

Notwithstanding the absence of support in the two cases it cites, the State argues that,

the GSA's refusal to provide plaintiff with a consistency determination regarding its imminent sale of the Athens property un-

---

1. The State created this plan in compliance with the CZMA, and the United States Secretary of Commerce approved the State's plan.

dermines the substantive underlying policy of the CZMA of protecting the coastal zone through the exercise of enforceable state policies.

This argument, like the reasoning that the Supreme Court rejected in *Romero–Barcelo*, "erroneously focuse[s] on the integrity of the [consistency process] rather than on the integrity of the Nation's waters." *Amoco Production Co.*, 480 U.S. at 542–43, 107 S.Ct. at 1402–03 (characterizing *Romero–Barcelo*). The primary purpose of the CZMA is "to preserve, protect, develop, and where possible, to restore or enhance, the resources of the Nation's coastal zone for this and succeeding generations...." 16 U.S.C. § 1452(1). The State has not shown how the failure to observe the procedural dictates of the CZMA has damaged the coastal environs in any way. The case involves the bare transfer of legal title, a transfer that does not contemplate any change in the present use of the property or surrounding area.

In the end, the State's argument on irreparable injury distills to this: the GSA's failure to observe the mandate of the CZMA irreparably injures the State by depriving it of its control over the property—control that it could have exercised through the consistency determination process.

With respect to this control, another consideration counsels against a finding of irreparable injury. The State suggests that the GSA's failure to comply with the CZMA prevented the State from "exercis[ing] its authority over the use and development of its coastal zone, as that right and authority relates to the property." *See* Memorandum in Support of Preliminary Injunction at 13. If control over the property were really the issue, the State should rejoice that the property is passing into the hands of a private owner who will be subject to the State's police and eminent domain powers. After the sale, the State may maximize its control over the property by taking it from the new owner. If it takes the property it must, of course, provide just compensation to the private owner. The measure of this just compensation is the measure of the State's injury. Therefore, if in retrospect the GSA's failure to observe the requirements of the CZMA truly injured the State, the State may seek money damages from the federal government.

In short, the State has not demonstrated irreparable injury.

### 2. Success on the Merits

■ Assuming that the State could show irreparable injury, the Court would have to consider the State's likelihood of success on the merits. In the present case, the State has not demonstrated a likelihood of success on the merits because (on the merits) it seeks a consistency determination to which it is probably not entitled.[2] A brief explanation is in order.

The CZMA requires federal agencies to take into account the effects of their actions on the Nation's coastal areas. To accomplish this, the CZMA and its implementing regulations require "federal agencies" undertaking "federal activities" to determine whether these activities directly affect the "coastal zone." The regulations define these terms rather broadly.[3]

The CZMA also encourages States to create their own coastal zone management programs and submit them to the Secretary of Commerce for approval. New York has created such a program, which the Secretary approved.

Under the federal regulations, States should list in their management programs those federal activities that they believe "are likely to directly affect the coastal zone and require a federal consistency determination." 15 C.F.R. § 930.35(a). New York has listed the GSA's "[d]isposition of Federal surplus lands and structures" as a federal activity

---

2. As noted below, the State has shown a likelihood that the GSA violated the CZMA, but only because the State listed GSA's disposition of property as an activity likely to affect the coastal zone. The State listed this activity in its Coastal Zone Management Plan.

3. The regulations define these terms at 15 C.F.R. §§ 930.17, 930.20, & 930.31. The definitions are material to this case.

likely to affect the coastal zone.[4] *See* State of New York Coastal Management Program and Final Environmental Impact Statement at II–9–18 (1986) (included at Appendix .to Memorandum in Support of Preliminary Injunction). Because the State has listed the sale of land as an activity likely to affect the coastal zone, the GSA was required to (1) decide whether to make a consistency determination, and (2) notify the State at least 90 days before final approval of the activity. *See* 15 C.F.R. § 930.35(d). Because the GSA's first auction took place on May 27, 1992, the State regards this as the date of final approval. Therefore, the State argues, at the very latest the GSA should have told the State by February 27, 1992 that it decided not to make a consistency determination. Under the regulations, the State is probably correct to say that the GSA should have informed the State of the decision not to make a consistency determination 90 days in advance of the auction.

■■■ This is not to say, however, that the regulations necessarily required the GSA to make a consistency determination. The State argues that the sale of the property is not merely a "federal activity,"[5] but more important, the sale is a "federal development project." *See* 15 C.F.R. § 930.31. That section provides as follows:

(a) The term "Federal activity" means any functions performed by or on behalf of a Federal agency in the exercise of its statutory responsibilities.

(b) A Federal development project is a Federal activity involving the planning, construction, modification, or removal of public works, facilities, or other structures, and the acquisition, utilization, or disposal of land or water resources.

The distinction is important because if the activity constitutes a federal development project, the federal agency must make a consistency determination.[6]

The trouble with the State's argument is that it reads the regulatory definition of "federal development project" too broadly. Under the State's definition, the U.S. Attorney's Office should have made a consistency determination prior to making the decision to seek an order of forfeiture in the first place, since the decision involves the "acquisition ... of land." This seems like an extravagant view of an agency's obligations under the CZMA.

This expansive view stems from the State's reading of the last clause of 15 C.F.R. § 930.-31(b). The phrase "disposal of land or water resources" could mean the "(1) the disposal of land or (2) the disposal of water resources." Under this view, which the State propounds, the Court might regard the sale of the property as the "disposal of land."

Another view, however, is possible. That same phrase might mean "(1) the disposal of land resources or (2) the disposal of water resources." In other words, the word "resources" might relate both to "land" and "water." "Land resources" might include timber, minerals, oil, top soil, and the like, rather than the title to the land itself. This

4. The GSA argues that the riverfront property in this case is not "surplus property." For purposes of this motion, the Court will assume that the property is "surplus." The Court does not decide the issue today because it does not have to in order to reach its decision.

5. The definition of "Federal activity" disposes of the GSA's contention that the State seeks to enjoin the wrong party. The gist of the GSA's argument along these lines is that "[e]njoining GSA to prevent the transfer is akin to enjoining a commercial real estate broker from closing a deal." *See* Memorandum in Opposition at 1–2. The GSA claims that, as the Marshal's real estate broker, it does not have the authority to prevent or direct the transfer of title. GSA's analogy, however, does not hold up under minimal scrutiny because a private real estate broker is not a federal agency performing its statutory mission

or acting "on behalf of a Federal agency." Unlike the activities of a private broker, the GSA's activities fall within the definition of Federal activity contained in 15 C.F.R. § 930.31(a). Moreover, as a person with notice who is "in active concert of participation" with the GSA, the Marshal would be bound by the injunction. *See* Fed.R.Civ.P. 65(d). In short, the GSA's agency relationship with the Marshals Service will not shield either from the obligations under the CZMA.

6. This follows from a regulatory presumption that "development projects" in the coastal zone constitute federal activities "directly affecting the coastal zone." If an agency's activities "directly affect" the coastal zone, the agency must provide a consistency determination. *See* 15 C.F.R. §§ 930.33(b) & 930.34(a).

view comports with the goal of the CZMA to avoid damage to the coastal environment. It is not clear how the disposition of legal title implicates—or to paraphrase the legislation, "directly affects"—the coastal zone. *See Ono v. Harper,* 592 F.Supp. 698, 700 (D.Haw. 1983) ("mere transfer of title does not directly affect coastal zone or state's management program").

Moreover, the regulatory definition of the term "federal development project" arguably contains two prongs: first, there must be some modification to the physical structure on the premises "and" there must be "acquisition, utilization, or disposal of land or water resources." *See* 15 C.F.R. § 930.31(b). The use of the word "and" conceivably creates a conjunctive test for defining "federal development projects." The State's argument treats "and" as a disjunction. Because an important regulatory presumption depends on the definition, the distinction is important.

 Thus, the State has not established the it is likely to prevail on the merits of its claim that it is entitled to a consistency determination. However, as noted above, the State has shown that the GSA violated the 90 day notice provision of section 930. *See* 15 C.F.R. § 930.35(d). This violation, rather technical in light of the likelihood that no consistency determination is warranted, hardly justifies preliminary injunctive relief.

### 3. *Balance of Hardships*

 Even if there were a sufficiently serious question going to the merits, the Court would be obligated to withhold the injunction after balancing the hardships, including those hardships that would fall upon non-parties like the prospective purchaser of the property. The purchaser arranged for financing his acquisition through a lending institution. His mortgage commitment is set to expire on April 22, 1993. Presumably, he has ordered his affairs in reliance on GSA's acceptance of his bid. If the Court were to enjoin the sale, he likely would lose his financing and the time between September, 1992 and the present.

The State, in contrast, would suffer relatively minimal hardship if the Court were to deny the present motion, in light of the Court's prediction that no consistency determination is required. At most, the State lost the 90 days notice of GSA's decision not to conduct a consistency determination, a decision that is probably correct. In contrast, if an injunction issues, GSA will have to market the property anew, and carry it until it finds a new buyer. The hardships do not, therefore, tip (decidedly or otherwise) in favor of the State. The Court hereby denies the motion for preliminary injunctive relief.[7]

IT IS SO ORDERED.

---

7. The sale of the riverfront property will not render the controversy moot, because the sale of such forfeited property is likely to be "capable of repetition yet evading review." This is a well-established exception to the mootness doctrine.