LEAVENWORTH AUDUBON ADOPT-A-FOREST ALPINE LAKES PROTECTION SOCIETY; North Central Washington Audubon Society; Knut and Aagaard; Dave and Valerie Huffman; and Ron and Jan Graves, Plaintiffs,

v.

Richard A. FERRARO, in his official capacity as Deputy Regional Forester, Pacific Northwest Region, U.S. Forest Service; Sonny J. O'Neal, in his official capacity as Forest Supervisor, Wenatchee National Forest, U.S. Forest Service; Rebecca Heath, in her official capacity as District Ranger, Leavenworth Ranger District, U.S. Forest Service; The United States Forest Service, an agency of the United States; Longview Fibre Co. and St. Joe Lumber Co., Defendants.

No. C94–1025C.

United States District Court,
W.D. Washington
at Seattle.

March 3, 1995.

Gregory Thomas Costello, David B. Merchant, Riddell, Williams, Bullitt & Walkinshaw, Seattle, WA, for plaintiffs.

Brian C. Kipnis, U.S. Attorney's Office, Seattle, WA, for Richard A. Ferraro, U.S. Forest Service, Sonny J. O'Neal and Rebecca Heath.

Elaine L. Spencer, Bogle & Gates, Seattle, WA, for Longview Fibre Co.

Blair Baker Burroughs, Mills Cogan Meyers & Swartling, Seattle, WA, Gary G. Stevens, Kevin R. Garden, Saltman & Stevens, Washington, DC, for St. Joe Lumber Co.

## ORDER ON MOTIONS

COUGHENOUR, District Judge.

Three non-profit conservation groups and several private citizens seek to enjoin timber sales from taking place in the Wenatchee National Forest. This matter is before the court on plaintiffs' and defendants' cross-motions for summary judgment. Having reviewed the parties' briefs, the administrative record, all relevant documents, heard oral argument, and being otherwise fully informed, the court finds and rules as follows:

## I. Background

The Wenatchee National Forest Land and Resource Management Plan ("Forest Plan") was adopted in 1990. In April, 1994, the Forest Plan was amended by the Record of Decision for Amendments to Forest Service and Bureau of Land Management Planning Documents within the Range of the Northern Spotted Owl (the "1994 ROD"). The 1994 ROD was the culmination of a federal interagency effort to incorporate economic and environmental interests in federal forests within the range of the northern spotted owl.

The area at issue is called the Tiptop sale area.[1] It is located northeast of Blewett Pass, south of Leavenworth, east of Washington State Route 97, and includes all or portions of the Camas, Little Camas, Ruby and Peshastin drainages. The Tiptop sale is outside the "critical spotted owl habitat area"

---

1. The Tiptop, Tip and Spromberg sales are collectively referred to by the parties as the Tiptop sale area.

as defined by the U.S. Fish and Wildlife Service.

In June, 1991, the Leavenworth Ranger District for the Wenatchee National Forest commenced an environmental assessment ("EA") for the Tiptop sale area. On July 14, 1993, the District Ranger issued a Decision Notice and Finding of No Significant Impact ("FONSI"), adopting a proposal to cut trees in the Tiptop area. The District Ranger rejected plaintiffs' contentions. Plaintiffs administratively appealed, and on December 13, 1993, the Forest Supervisor upheld the District Ranger's Decision Notice. The Regional Forester affirmed.

This suit followed. On July 26, 1994, the parties agreed to enjoin the disputed timber sales pending the outcome of the cross-motions for summary judgment.

## II. NEPA Violations

Plaintiffs contend that the Forest Service failed to consider the impact of the project on the viability of the bull trout, the watershed conditions, the old-growth ponderosa pine stands, and the serpentine soils in the area.

■ NEPA requires the preparation of an EA to ensure that the agency will carefully consider detailed information concerning significant environmental impacts. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350, 109 S.Ct. 1835, 1845–46, 104 L.Ed.2d 351 (1989). It also guarantees that relevant information will be made available to a larger audience, which may play a role in the decision-making and implementation processes. *Id.*

■ When reviewing a challenged administrative action, the court must apply the arbitrary and capricious standard. *Greenpeace Action v. Franklin,* 14 F.3d 1324, 1331 (9th Cir.1992); 5 U.S.C. § 706. This standard requires the court to determine that an agency has taken the requisite "hard look" at the environmental consequences of its proposed action. *Kleppe v. Sierra Club,* 427 U.S. 390, 410, 96 S.Ct. 2718, 2730, 49 L.Ed.2d 576 (1976). The court must scrutinize the

record to ascertain whether the agency decision is founded on consideration of the relevant factors, and whether there was a clear error of judgment. *Motor Vehicle Mfrs. Asso. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983); *United States v. Alpine Land and Reservoir Co.,* 887 F.2d 207, 213 (9th Cir.1989).

■ Because analysis of the relevant documents requires a high level of technical expertise, the court must defer to the informed discretion of the responsible federal agencies. *Kleppe v. Sierra Club,* 427 U.S. at 410, 96 S.Ct. at 2730 (1976). "NEPA merely prohibits uninformed—rather than unwise—agency action." *Robertson,* 490 U.S. at 351, 109 S.Ct. at 1846 (1989).

### A. Consideration of the Bull Trout

■ The Forest Plan states that, "[a]ll proposed projects that may involve significant habitat disturbances or changes, or have the potential to alter habitat of threatened, endangered, or sensitive plant and animal species, shall be inventoried to determine if any of these species are present." AR 53 at IV–78.[2]

Plaintiffs argue that the Forest Service failed to consider the impact of the timber sale on the bull trout, a sensitive species and a management indicator species under the Forest Plan.

As plaintiffs point out, the EA simply notes that the bull trout is a "possible" resident of unspecified streams within the sale area, and mentions that it is on the Regional Forester's sensitive species list. AR 672 at 18. The Forest Service did not inventory the bull trout, nor did it determine whether the proposed project would involve significant habitat disturbances. The Forest Service's failure to consider and document the presence of the bull trout is inconsistent with the Forest Plan.

The Forest Service has provided a declaration of Daniel Rife, Zone Fisheries Program

---

**2.** The court refers to the administrative record as "AR", document number "53," page number "IV–78."

Manager for the Wenatchee National Forest, which explains that the proposed project does not involve significant habitat disturbances requiring an inventory of the bull trout.

■ To a limited extent, post-decision information may be used to clarify or provide an explanation of the original information before the agency. It is inappropriate, however, to use post-decision information as a new rationalization for sustaining the agency's decision. *Association of Pacific Fisheries v. EPA,* 615 F.2d 794, 811 (9th Cir.1980). Mr. Rife's declaration does not explain nor clarify the record, but, rather, provides an analysis of the bull trout that should have been made in the administrative proceedings. As such, Mr. Rife's declaration constitutes a post-decision justification for the agency's decision not to inventory the bull trout or consider whether the project would create significant habitat changes.

■ Plaintiffs request that the timber sales be enjoined until a Species Management Guide for the bull trout is developed. However, the Forest Plan requires that Species Management Guides be developed for each sensitive species so that all guides are completed by the tenth year after approval of the Final Forest Plan. AR 53 IV–78. The Forest Plan was adopted in 1990. The Forest Service need not develop a Species Management Guide for the bull trout prior to the initiation of this project.

Nevertheless, in the absence of a Species Management Guide, the Forest Service must analyze the project area with all the relevant information available. A draft bull trout Species Management Guide was circulated in March, 1992. While the Forest Service states, generally, that draft Species Management Guides are used in the analysis of proposed projects, and Mr. Rife used a draft Species Management Guide in preparing his declaration, the Forest Service does not state that it actually used the draft Species Management Guide for the bull trout in preparing the EA. Defendants' Memorandum at 8; Rife Declaration ¶ 3.

The Forest Plan requires that the Forest Service consider and document whether the bull trout is present in the sale area. NEPA also requires that the Forest Service investigate the presence of the bull trout in the area. The court concludes that the Forest Service's decision not to consider whether the bull trout is present in the sale area, or whether the project will cause significant habitat disturbances after its own experts determined that the bull trout "possibly exists" in the sale area is arbitrary and capricious.

### B. Watershed Conditions

#### 1. Unrecovered Conditions

■Plaintiffs argue that the Forest Service failed to use an appropriate model to gather information on the watershed conditions simply because there was no model "usable within the time frame for the analysis." AR 672 at 20. Plaintiffs argue that the Forest Service's failure to take a hard look at the watershed conditions violates NEPA.

The Forest Service used a modified Aggregate Recovery Percentage (ARP) model to conduct a cumulative effects watershed analysis. A cumulative effects analysis measures the impact of management activities, such as logging, within a watershed. AR 672 at 19. It is usually measured by a hydrologic recovery model. *Id.* Basin hydrologic recovery is a measure of the watershed's condition. *Id.* A watershed that has not been entered is considered totally recovered. If a basin has been entered, then "recovery" is based on the acreage, age, and canopy closure of the new stand of trees. *Id.* An unrecovered or partially recovered watershed is more likely to suffer a destructive flood event. *Id.*

The ARP model determines how much of a watershed is in unrecovered condition. According to the ARP model, an unrecovered condition is one in which the canopy closure is less than 70% due to fire and/or management activities. AR 672 at 20.

The Forest Service modified the ARP model because there was not "an appropriate cumulative effects model available within the time frame for the analysis that fit the proposed type of harvest (partial cutting with intense roading)." AR 672 at 20.

The modified ARP model recorded levels of disturbance, rather than measuring unrecovered conditions. The levels of disturbance were measured by visual estimates of both soil disturbance and unrecovered condition. The analysis was conducted by "ground reconnaissance, aerial photos, past harvest records, and a measure of professional judgment." AR 672 at 20.

The court must defer to agency expertise on questions of methodology unless the agency has completely failed to address some factor, consideration of which was essential to a truly informed decision. *Inland Empire Public Lands Council v. Schultz*, 992 F.2d 977, 981 (9th Cir.1993) (quoting *Foundation for N. Am. Wild Sheep v. United States Dep't of Agric.*, 681 F.2d 1172, 1178 (9th Cir.1982)).

Using the modified ARP model, the Forest Service made the following assessment: 37% of the Ruby Creek drainage is in a 75%–100% disturbed condition. This level of disturbance is unrecovered ground as defined by the ARP model. An additional 37% of the drainage is in a 50–75% disturbed condition which is determined by detrimental soil conditions, and is in "somewhat unrecovered" condition. *Id.*

The percentage of unrecovered condition within a watershed is a relevant factor necessary to make an informed decision because the Forest Plan requires that a detailed watershed analysis be conducted "when 40% of the forested area in a 1000 acre or larger subdrainage is projected to be in openings at one time. (An opening is defined as the condition when the regeneration crop is less than fifteen feet tall.)" AR 53 IV–97.

The Forest Service argues that only 37% of the Ruby Creek drainage is in unrecovered condition, and all of the alternatives for the proposed project would increase the unrecovered condition by 0–2.1%. Therefore, a detailed watershed analysis is not required under the Forest Plan.

The Forest Service's determination that 37% of the Ruby Creek drainage is in unrecovered condition is very close to the Forest Plan's requirement that a detailed watershed analysis be conducted when canopy openings constitute 40% of the drainage. Nevertheless, the Forest Service has not completely failed to address the watershed's unrecovered condition, consideration of which is essential to making an informed decision. The court concludes that the modified ARP model provided a sufficient methodology for the Forest Service to evaluate the watershed's unrecovered condition, and a detailed watershed analysis is not required.

The ARP model also states that a watershed is considered at risk of increased flooding if the total unrecovered area is more than 25% of the watershed. Plaintiffs argue that the Forest Service's decision to increase the drainage's unrecovered condition by 0–2.1% when the watershed already exceeds the 25% flood hazard figure is arbitrary and capricious. The purpose of NEPA, however, is to prevent uninformed, not unwise decisions. The ARP model's 25% flood hazard figure has not been adopted as an internal directive, nor is it part of the Forest Plan. The Forest Service decision to exceed the 25% flood hazard figure is not arbitrary and capricious.

## 2. Soils in Detrimental Condition

Plaintiffs also argue that the detrimental soil conditions in the Ruby Creek area were not adequately considered. A detrimental soil condition is produced by compaction, displacement, puddling, or severe burning. AR 53 IV–97.

The EA provides the following assessment: 37% of the soils in the Ruby Creek drainage are in 50–75% disturbed condition. Additionally, 37% of the drainage is in 75–100% disturbed condition which is determined to be in unrecovered condition. Within the 75%–100% disturbed condition, soils are compacted by "tractor roads and skid trails." AR 672 at 20.

Plaintiffs assert that 74% of the drainage, (37% in 50–75% disturbed condition plus 37% in 75–100% disturbed condition) is in detrimental soil condition. The Forest Service contends that plaintiffs' assertion of 74% "confuses" discussions of detrimental soil conditions and percentages of canopy openings. Whatever confusion there is, however,

is the result of the Forest Service's modification of the ARP model which confounds unrecovered conditions and detrimental soil conditions. Notably, the Forest Service does not provide an alternative assessment of detrimental soil conditions in the drainage. It appears that 37% of the soils in the Ruby Creek drainage, and an unquantified additional amount, are in detrimental condition.

The Forest Plan requires that "the total acreage of all detrimental soil conditions in an area should not exceed 20% of the total acreage of the activity area." AR 53 at IV–97. The Ruby Creek drainage already exceeds the Forest Plan's standards and guidelines on detrimental soil conditions whether the court determines that 37% of the soils are in detrimental condition, or accepts plaintiffs' 74% estimation.

While the drainage exceeds the Forest Plan's guidelines for detrimental soil conditions, the Forest Service has not violated the Forest Plan unless the impact of the project increases the detrimental soil condition, in this case, by any amount. The EA does not quantify the impact of the proposed project on the detrimental soil conditions. AR 672 at 73.

The court holds that the impact of the project on the detrimental soil conditions of the Ruby Creek drainage is a relevant factor that the Forest Service failed to adequately consider and document in violation of NEPA.

## C. Old–Growth Ponderosa Pine Stands and Timber Suitability

Plaintiffs argue that the Forest Service failed to adequately analyze the impact of the sale on the old-growth ponderosa pine stands. Plaintiffs primarily contend that the Forest Service failed to follow the Regional Forester's August 1993 directive which requires Forest Supervisors to defer all 1993 timber sales that have a potential impact on eastside old-growth forests until the sales are analyzed using a five-step screening process. As discussed in Section II.E.2, however, the directive does not apply to the timber sales in this case.

■ Plaintiffs also contend that the Forest Service failed to conduct an analysis of the sale on the old-growth ponderosa pine stands in the area. The EA documented that the south aspects of the sale area support an overstory of mature ponderosa pine scattered in 60–120 year old stands of ponderosa pine, Douglas-fir, and grand fir. AR 672 at 14. The EA discusses the four seral stages. AR 672 at 14, 18; Supplemental AR at Appendix E. The Forest Service adopted the proposed alternative that no mixed conifer old-growth stands be harvested. AR 672 at 48; Supplemental AR at Appendix E. The Forest Service adequately considered the impact of the sale on the old-growth ponderosa pine stands.

■ Plaintiffs also assert that the Forest Service arbitrarily reclassified areas previously classified as unsuitable for timber harvest without documentation. The Forest Service provided sufficient documentation for its reclassification of timber suitability: all the units were field-visited, measured, and reclassified as suitable because the "stands are producing at least 20 cubic feet per acre per year, can be regenerated within five years and are able to be harvested without causing irreversible resource damages." AR 582, 672 at 38, 822, 823, 875. The Forest Service also addressed the issue of timber suitability in response to plaintiffs' administrative appeal. AR 822, 823. The Forest Service adequately considered the issue of timber suitability in the sale area.

## D. Serpentine Soils

Plaintiffs argue that the Forest Service failed to adequately consider the impact of logging on serpentine soils. Serpentine soil is a bedrock composed of magnesium iron silicate, formed by metamorphosis of peridotite. AR 579. The serpentine soils are highly erosive and prone to compaction. AR 672 at 19. The Forest Service considered the impact of the project on soil erosion on the steep slopes and scree slopes within the sale area, and recommended that the timber harvest be completed so that logs are totally suspended at all times in order to reduce soil disturbance. AR 579–583.

■ Plaintiffs further assert that the EA did not address the Forest Service's own

expert's recommended mitigation measure for serpentine soils. Carl Davis, a Forest Service Soil Scientist, recommended that the Forest Service restrict top-soil disturbance to 5% in the sale area due to the project area's steep slopes and large amount of scree slopes. AR 583. Davis clarifies in a declaration that his recommended 5% disturbance factor was meant to protect scree slopes in the project area, and not the entire project area.

■ Plaintiffs argue the court may not consider Davis' declaration because it contains post-decision information used to justify the agency's action. *Association of Pacific Fisheries,* 615 F.2d at 811. Contrary to plaintiffs' characterization, however, Davis' declaration is a permissible clarification of his original recommendation.

Davis' declaration also explains how the Forest Service incorporated his recommended mitigation measures into the EA: (1) due to the slope stability factor of the serpentine bedrock, the Forest Service has proposed constructing less than ¼ mile of new roads; (2) a person with experience in slope stability assessments located the new road; and, 3) the Forest Service adopted the Skyline harvest method in order to reduce the miles of road necessary. AR 583; Davis Declaration ¶ 5. The court concludes that Forest Service has addressed and followed the recommendations of its experts.

■ Plaintiffs further assert that the Forest Service did not evaluate the regenerative capacity of the serpentine soils in the sale area. Field visits of all the units were made to determine if the soil was stable enough to allow natural regeneration. AR 564, 568, 579–583, 672 at 34–38. The EA also projected how each proposed project alternative would affect soil productivity. AR 672 at 84. The court concludes that the EA sufficiently documented and analyzed the regenerative capacity of the serpentine soils in the project area.

### E. New Scientific Information and Circumstances

Plaintiffs argue that the Forest Service failed to supplement the EA in light of new scientific information and the recent wildfires that burned in the Wenatchee area. The Forest Service must prepare a supplement to its environmental analysis of an action if there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 372, 109 S.Ct. 1851, 1858, 104 L.Ed.2d 377 (1989); *Headwaters, Inc. v. Bureau of Land Management,* 914 F.2d 1174 (9th Cir.1990). "In the context of reviewing a decision not to supplement an [EA], courts should not automatically defer to the agency's express reliance on an interest in finality without carefully reviewing the record and satisfying themselves that the agency has made a reasoned decision based on its evaluation of the significance—or lack of significance—of the new information." *Marsh,* 490 U.S. at 378, 109 S.Ct. at 1861.

### 1. Eastside Report

■ Plaintiffs contend that the Forest Service failed to consider a report submitted to the U.S. Congress in September, 1993 (the "Eastside Report") which contains the most credible scientific information available on the management of eastside forests. The Forest Service argues that the Eastside Report is irrelevant because it has not been adopted as management direction, and dismisses it as having been issued by private special interest groups. Defendants' Memorandum at 5.

The Forest Service may not dismiss all information that is not "management direction." Moreover, the fact that the report is published by private special interest groups does not necessarily make the information insignificant. The Forest Service's decision not to consider the significance of the new information contained in the Eastside Report lacks the "careful scientific analysis" required by NEPA.

### 2. August 18, 1993 Regional Forester's Interim Directive

■ Plaintiffs also argue that the August 1993 directive should be applied to the Tiptop sale area. The August 1993 letter issued by the Regional Forester directs the Forest Supervisors in nine National Forests in Eastern

Oregon and Washington to defer all 1993 timber sales that have a potential impact on eastside old-growth forests until the sales are analyzed using a five-step screening process.

The August 1993 directive states that it does not apply to those portions of the eastside forests covered by the 1994 ROD. AR 683. It is undisputed that the Wenatchee National Forest is subject to the 1994 ROD. Therefore, the Tiptop timber sale area is not governed by the August 1993 directive.

Plaintiffs argue that the 1993 directive should be interpreted to mean that it applies to all areas that do not conflict with the 1994 ROD. This argument is unpersuasive. The plain language of the directive states that it does not apply to those portions covered by the 1994 ROD.

■ Contrary to plaintiffs' argument, the fact that the 1994 ROD contains a more restrictive directive on old-growth forests does not mean that directives which expressly exclude themselves from the 1994 ROD are superseded.

■ As with any new scientific information, the Forest Service must make a reasoned evaluation of the significance—or lack of significance—of the new scientific information contained in the August 18, 1993 directive and subsequent 1994 May Amendments. The fact that the August 1993 directive does not apply to the sale area does not render the scientific information contained in the directive necessarily insignificant. The Forest Service must determine the significance of the scientific information underlying the August 1993 directive.

### 3. The 1994 Summer Wildfires

■ Plaintiffs argue that the Tiptop sale area should be reexamined in light of the wildfires that burned in the Leavenworth/Wenatchee area over the summer of 1994. The 1994 wildfires burned to within a quarter mile of the sale area, but did not reach it.

Defendants claim that the 1994 wildfires do not constitute an extraordinary event requiring additional analysis prior to harvesting the timber. The Forest Service points out that courts have consistently ruled that administrative agencies should not be required to reopen their final orders except in the most extraordinary circumstances. *Oregon Natural Resources Council v. Lowe,* 836 F.Supp. 727, 737 (D.Or.1993) (quoting *Blackfeet Tribe v. U.S. Dept. of Labor,* 808 F.2d 1355, 1358 (9th Cir.1987)).

The case law cited by defendants is distinguishable because, here, the extraordinary circumstance is not new scientific information, but a natural occurrence that has altered the landscape of the entire Wenatchee National Forest.

The Forest Service provides no reasoned evaluation for its conclusion that the wildfires do not constitute an extraordinary circumstance. Robert Stoehr, the Silviculturist for the Wenatchee National Forest, simply states that the Wenatchee National Forest is historically prone to frequent wildfires, some of which become very large, and thus the recent fires do not constitute an extraordinary event. Stoehr Declaration.

The court disagrees. While wildfires occur periodically and play an ordinary role in the development of the Wenatchee National Forest, the 1994 fires were, by all accounts, exceptional. In fact, the fires were the second largest on record for the Wenatchee National Forest. AR 53 at Table II–45. The court concludes that the fires constitute an extraordinary event requiring supplementation of the EA.

### a. Old Growth Ponderosa Pine

■ Plaintiffs assert that the Forest Service should reexamine how the logging of old-growth ponderosa pine impacts the survivability of the species in light of the 1994 wildfires.

The Forest Service argues that, even if the wildfires were extraordinary, thereby requiring a reexamination of the impact of the sale on the project area, the logging of the timber sales will not affect the survivability of the ponderosa pine species because the Tiptop sale proposes to harvest no old-growth stands. Stoehr Declaration ¶ 4. Having provided a reasoned evaluation of the lack of significance of the new circumstance, even in determining that the wildfires were extraor-

dinary, the Forest Service need not reevaluate the impact of the timber sale on the old-growth ponderosa pine stands in the sale area.

### b. Watershed Conditions

 Plaintiffs also argue that, due to the increased canopy openings near the sale area, the 1994 wildfires have caused increased sedimentation and higher water temperatures in the streams that run through the project area. High sediment levels kill small macroinvertebrates living in the streams, and can bury bull trout eggs. High water temperatures increase fish mortality, and decrease the amount of suspended oxygen in a stream. Costello Decl., Ex. E; Ex. H.

The Forest Service has not shown that the 1994 wildfires have not had a significant effect on the streams in the project area. The Forest Service argues that if the effects of the wildfires indicate changes are needed to the Tiptop timber sale contracts, then those changes "will be made in the future." Defendants' Memorandum at 11. The Forest Service must evaluate the effects of the fires on the watersheds within the Tiptop sale area before the contracts performed, and before the trees are cut.

The Forest Service must reexamine the impact of the proposed project on the sediment quality and water temperatures of the streams in the sale area in light of the 1994 wildfires in order to make an informed decision on the impact of the project on the watershed conditions.

### III. National Forest Management Act

Pending further compliance by the Forest Service with NEPA in determining the impact of the project on the bull trout, the watersheds' detrimental soil conditions, stream quality, and the decisions that may follow, there is no need to decide whether the timber sale violates the Forest Service's standards and guidelines under NFMA, 16 U.S.C. § 1600 *et seq.*, on these issues. *See, Seattle Audubon Society v. Moseley,* 798 F.Supp. 1473, 1484 (W.D.Wash.1992).

### IV. St. Joe's Motion for Summary Judgment on Laches

 St. Joe Lumber Company has separately moved for summary judgment on the grounds that plaintiffs' claims should be barred by the doctrine of laches. The doctrine of laches requires proof of (1) an unreasonable and inexcusable delay in bringing suit; (2) which results in undue prejudice to the other party. *Lathan v. Volpe,* 455 F.2d 1111, 1122 (9th Cir.1971). Plaintiffs filed this lawsuit four months after exhausting their administrative appeals. Plaintiffs' delay was not unreasonable, and no undue prejudice resulted.

### V. Injunctive Relief

 Injunctive relief is appropriate where there is a likelihood of irreparable injury and an inadequacy of legal remedies. *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982). The Supreme Court has held that:

> Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e. irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment. *Amoco Prod. Co. v. Gambell,* 480 U.S. 531, 545, 107 S.Ct. 1396, 1404, 94 L.Ed.2d 542 (1987).

The court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. *Id.* at 542, 107 S.Ct. at 1402–03.

 The Tiptop timber sale may irreparably harm the viability of the bull trout, a sensitive species, and a management indicator species under the Forest Plan. The sale may also irreparably harm the detrimental soils condition of the Ruby Creek drainage. The wildfires may have further damaged the streams' sediment levels and water temperatures. While the court recognizes the financial burden the Forest Service and logging companies will suffer as a result of the injunction, the likely irreparable environmental

harm is grave when compared to the adverse monetary impact the defendants may suffer.

The court is sympathetic to the plight of the lumber companies. Nevertheless, the sale must be enjoined until the Forest Service has taken the requisite "hard look" at the effect of the timber sale on the project area, and ensure that the sale complies with the Forest Service's standards and guidelines under NFMA.

## VI. Conclusion

Plaintiffs' and defendants' motions for summary judgment and permanent injunction are GRANTED in part and DENIED in part. Plaintiffs' motion for summary judgment on whether the Forest Service failed to adequately consider the bull trout, the watershed conditions of the Ruby Creek drainage, and whether the 1994 wildfires constitute an extraordinary event is GRANTED. However, the Forest Service need not reexamine the impact of the timber sale on the survivability of the ponderosa pine species in light of the 1994 wildfires.

The defendants' motion for summary judgment that the Forest Service is in compliance with the applicable laws and regulations regarding old-growth ponderosa pine stands, and erosive serpentine soils is GRANTED.

St. Joe Lumber Company's motion for summary judgment on laches is DENIED.

The court enjoins the Tiptop timber sale until the Forest Service completes a supplemental Environmental Assessment. The supplemental EA must consider and document the following:

(1) the impact of the project on the bull trout in the Tiptop sale area;

(2) the effect of the project on the detrimental soil conditions of the drainage areas in the Tiptop sale area;

(3) the significance of the scientific information in the Eastside Report, and the August, 1993 Regional Forester's Interim Directive, and subsequent May 1994 Amendments; and

(4) the impact of the proposed project on the Tiptop sale area's streams' sediment quality and water temperatures in light of the 1994 wildfires.