*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, e-mail corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| PLUMBERS & PIPEFITTERS, LOCAL 367, | ) ) | Supreme Court No. S-14664 |
| | ) | |
| Appellant, | ) | Superior Court No. 3AN-11-10463 CI |
| | ) | |
| v. | ) | O P I N I O N |
| | ) | |
| MUNICIPALITY OF ANCHORAGE, | ) | No. 6770 - March 29, 2013 |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Alex Swiderski, Judge pro tem.

Appearances: Charles A. Dunnagan and James S. Mundy, Jermain Dunnagan & Owens, P.C., Anchorage, for Appellant. William A. Earnhart, Assistant Municipal Attorney, and Dennis A. Wheeler, Municipal Attorney, Anchorage, for Appellee.

Before: Winfree, Stowers, Maassen, and Bolger, Justices. [Fabe, Chief Justice, not participating.]

PER CURIAM

A union and a municipality entered into collective bargaining to renew the union's expiring contract. When negotiations broke down, the parties entered into arbitration, but the arbitrator's proposed decision failed to garner the necessary municipal assembly votes to become binding on the parties. Under the municipality's labor ordinances, the assembly's failure to approve the arbitrator's decision resulted in an

impasse, with each party given a remedy: the municipality could implement its last best offer presented at arbitration, and the union could go on strike. However, the union's statutory right to strike was limited and could be enjoined if the work stoppage threatened public health and safety.

Although the union voted to strike, it agreed to a preliminary injunction before the strike was scheduled to begin because work stoppage would threaten public health and safety almost immediately. The union then argued that the superior court should impose the arbitrator's decision as a condition of a permanent injunction to compensate for "taking away" the union's right to strike. The superior court held that its equitable jurisdiction was constrained by the municipal code, which had no provision for imposing the arbitrator's decision, and entered an order permanently enjoining the strike and allowing the municipality to implement its last best offer. The union appeals, arguing the superior court erred as a matter of law in holding the municipal code limited its equitable power to impose contract conditions as part of a permanent injunction.

We AFFIRM the superior court in all respects and adopt its decision, which is attached as an appendix.[1]

---

[1]     On appeal the union discusses several United States Supreme Court cases for the first time. These cases are unpersuasive primarily because they involve decisions whether an injunction would be granted rather than substantive conditions on an injunction. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008) (noting trial court should consider balance of equities and public interest when deciding whether to issue injunction); *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 544 (1987) (holding trial court had equitable discretion not to issue injunction under the Alaska National Interest Lands Conservation Act); *Weinberger v. Romero-Bercelo*, 456 U.S. 305, 320 (1982) (holding trial court had equitable discretion not to issue injunction for Clean Water Act violation).

APPENDIX

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

THIRD JUDICIAL DISTRICT AT ANCHORAGE

MUNICIPALITY OF ANCHORAGE, )
                            )
          Plaintiff,        )
                            )
v.                          )
                            )
UNITED ASSOCIATION OF       )
PLUMBERS AND PIPEFITTERS,    )
LOCAL 367,                  )
                            )
          Defendant.        )
_____ )
Case No. 3AN-11-10463 CI

**ORDER GRANTING MUNICIPALITY'S MOTION FOR
DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**[**]

## I.      INTRODUCTION

The Plumbers and Pipefitters, Local 367 (Union) and the Municipality of Anchorage have been engaged in negotiations over a new collective bargaining agreement for more than one year. The parties came to an agreement on many aspects of a new collective bargaining agreement but could not come to terms on several key points. The dispute was submitted to an arbitrator as called for by the Anchorage Municipal Code (AMC). The arbitrator issued a decision adopting the Union's last best

_____

[**]     The superior court's decision has been edited to conform to the technical rules of the Alaska Supreme Court.

offer on the primary issue of across-the-board wage increases. The arbitrator's decision was put before the Anchorage Assembly for approval. The Assembly failed to approve the arbitrator's decision. The Union's employees then voted to strike.

The Municipality filed for a preliminary injunction before the strike was set to begin, arguing that the planned strike would threaten the public health, safety, and welfare. The Union agreed that a strike by Union employees would pose an unacceptable risk to the public and did not oppose issuance of a preliminary injunction.

Both parties now ask the Court to enter a permanent injunction prohibiting the Union from going on strike through June 2013 — when the next round of collective bargaining would begin. The Union further asks the Court to declare the arbitrator's decision binding upon the parties as a condition of entering the injunction. The Municipality opposes this request and instead asks the Court to issue a declaratory judgment following AMC 03.70.110.C.10.b — that the arbitrator's award is unenforceable, that the parties are at an impasse in their negotiations, and that the Municipality may implement its last best offer.

Because the Court concludes that the AMC forecloses the relief sought by the Union and mandates the relief sought by the Municipality, the Court grants the permanent injunction and the Municipality's request for declaratory judgment.

## II.    BACKGROUND

Collective bargaining involving public employees is a highly regulated process. The Court begins its analysis by reviewing the legal framework for collective bargaining involving Municipality employees before turning to the specific facts and procedural history of this case.

APPENDIX

## A.    The AMC's Employee Relations Chapter

Local governments have the power to fashion their own labor ordinances and systems of collective bargaining.[1]  The Assembly chose to regulate employee relations through Title 3, Chapter 70 of the AMC.  The general policy behind Chapter 70 is to "promote harmonious and cooperative relations between the municipality and its employees and to protect the public by ensuring orderly and effective operations of government."[2]

Chapter 70 grants all non-exempt Municipal employees the right to organize for the purpose of collective bargaining.[3] Collective bargaining occurs between the bargaining unit's representative on the one hand and the mayor's office . . . on the other.[4]  While the mayor's authorized negotiating team conducts collective bargaining on behalf of the Municipality, the Assembly has the power to set the Municipality's general labor relations policy and to direct specific contract negotiations.[5]  In addition,

---

[1]    *See Anchorage Mun. Emps. Ass'n v. Municipality of Anchorage*, 618 P.2d 575, 580 (Alaska 1980).

[2]    AMC 03.70.020.A.

[3]    AMC 03.70.030, .060.C.

[4]    *See* AMC 03.70.090.

[5]    AMC 03.70.090.D.

any agreement between the Municipality and the bargaining representative must be ratified by the bargaining unit and the Assembly.[6]

In the event that the parties are unable to reach an agreement during the collective bargaining process, Chapter 70 provides a series of steps that the parties must undertake in moving towards a resolution of the dispute: mediation;[7] fact finding;[8] and, finally, interest arbitration.[9]

As part of the arbitration process, each party must submit its Last Best Offer (LBO) on each individual outstanding issue. In resolving each issue in question, the arbitrator is limited to selecting one of the parties' LBOs — the arbitrator may not craft his or her own resolution to a particular issue, nor may he or she combine portions of each party's LBO on a given issue.[10] The arbitrator must hold hearings and issue a decision within 60 days of the expiration date of the collective bargaining agreement.[11]

At this point the rights and remedies of each party depend on the classification of the affected bargaining unit employees. The AMC splits Municipality

---

[6]    AMC 03.70.130.A.

[7]    AMC 03.70.100.A.

[8]    AMC 03.70.100.B.

[9]    *Id.*

[10]    AMC 03.70.110.C.7.

[11]    AMC 03.70.110.C.4.

employees into three classes: Class A.1 employees, Class A.2 employees, and Class A.3 employees.[12]

*Class A.1 employees.* Class A.1 employees are those who engage in police, fire protection and emergency services.[13] Under the AMC, an arbitrator's decision affecting Class A.1 employees is automatically binding upon the parties.[14] However, Class A.1 employees are flatly prohibited from going on strike for any period of time.[15]

*Class A.2 and A.3 employee*s. Class A.2 is made up of employees in sewer and water treatment, electrical generation and transmission, and port operation.[16] Class A.3 is made up of all other employees.[17] Both classes of employees are treated similarly when it comes to the effect of an arbitrator's decision: in each case, AMC 03.70.110.C.10.b provides that the arbitrator's decision is binding on the parties only if it is approved by at least eight members of the Assembly.

Prior to the Assembly's vote, the Municipality's internal auditor must review the arbitrator's decision and the Municipality's LBO, and provide the projected

---

[12]    *See* AMC 03.70.110.A.

[13]    AMC 03.70.110.B.

[14]    AMC 03.70.110.C.10.a.

[15]    *See* AMC 03.70.110.A.1.

[16]    AMC 03.70.110.B.

[17]    *Id.*

costs and savings under each option.[18] If the Assembly does not approve the arbitrator's decision within a specified period of time, then "the parties shall be considered at impasse," "[t]he municipality may . . . implement its last best offer" and "the affected bargaining unit may exercise its right to strike."[19]

While Class A.2 and A.3 employees are treated the same for purposes of arbitration, they are not given the same right to strike. The AMC grants Class A.2 only a "limited" right to strike[20] with the limit determined "by the interests of the health, safety and welfare of the public."[21] Class A.3 employees, on the other hand, are granted an almost unfettered right to strike absent "extraordinary circumstances."[22]

Section 3.70.110.B of the AMC allows the Municipality to apply to the superior court for an order enjoining a strike by Municipal employees. In the case of Class A.2 employees, the superior court may only enjoin the strike if it has begun to threaten the health, safety, or welfare of the public.[23] The AMC further counsels:

> A court in deciding whether or not to enjoin the strike shall consider the total equities in the particular class. . . . [T]he term 'total equities' includes not only the impact of the strike on the public but also the extent to which employee

---

[18] AMC 03.70.110.C.10.b.

[19] *Id.*

[20] AMC 03.70.110.A.2; AMC 03.70.110.B.

[21] AMC 03.70.110.B.

[22] *See* AMC 03.70.110.A.3; AMC 03.70.110.B.

[23] AMC 03.70.110.B.

organizations and public employers have met their obligations under [the employee relations chapter].[24]

The AMC does not specifically state what effect the issuance of an injunction has on the parties or the collective bargaining process.

## B.     Facts And Procedural History

The Union represents employees of the Anchorage Water and Wastewater Utility (AWWU) — a division of the Municipality. These employees are responsible for the operation and maintenance of Anchorage's drinking water and sewage treatment plants. They are Class A.2 employees under the AMC.[25]

The Union and the Municipality began negotiations for a new collective bargaining agreement in March or April of 2010. The parties' prior collective bargaining agreement expired on June 30, 2010. The parties have maintained the status quo of the terms and conditions of employment — meaning, primarily, that Union employees have not received an across-the-board wage increase since July 1, 2009.

Despite ongoing negotiations, the parties were unable to agree on several key aspects of a new agreement. Pursuant to the AMC, the parties underwent mediation, fact-finding, and finally arbitration of the parties' remaining disputes. Retired Judge Douglas Serdahely served as fact-finder and arbitrator. The primary issue put before the arbitrator dealt with across-the-board wage changes, a one-time market-based adjustment to the wage scales, and the continuation or termination of the "Service Recognition Program." In accordance with AMC 03.70.110.C.8.a(2), these issues were all treated as

---

[24]     *Id.*

[25]     *See id.*

one lump subject such that the arbitrator had to select between the Union's and the Municipality's LBOs as to all three sub-issues.

The Municipality's LBO consisted of no across-the-board wage increase in 2010, followed by a 2.5% wage increase in 2011 and another 2.5% wage increase in 2012. The Municipality's LBO contained no market-based adjustment and proposed to eliminate the Service Recognition Program for new employees.

The Union's LBO consisted of no across-the-board wage increase in either 2010 or 2011, with an across-the-board wage increase in 2012 equal to the Anchorage CPI-U (Consumer Price Index) average for the previous five-year period — with a minimum increase of 2.5% and a maximum increase of 3.9%. The Union further proposed a one-time market-based adjustment in 2011 amounting to an increase of $3.00 per hour for most union employees. The Union also proposed that the Service Recognition Program continue in its present form.

An arbitration hearing was held on July 25, 2011, and the arbitrator issued his decision on August 8, 2011. The arbitrator selected the Union's LBO on the issue of wages. The arbitrator found that there was a significant disparity between the wages of the Union's employees and the wages of similar workers within the Municipality and in the private sector. The arbitrator also rejected the Municipality's argument that smaller pay increases were necessary in light of the post-recession economy, noting that the Municipality and the IBEW Mechanics' union had recently agreed to a contract providing for substantially greater pay increases than the Municipality had offered the Plumbers and Pipefitters' union.

APPENDIX

The net result of the arbitrator's decision was that Union employees would receive a one-time $3 per hour wage increase in 2011 and a wage increase between 2.5% and 3.9% in 2012. In addition, the Service Recognition Program would continue for all union employees.[26]

The arbitrator's decision was sent to the Assembly for approval. An internal audit report indicated that implementation of the arbitrator's decision would cost the Municipality between $3,191,722 and $3,394,446 through June 30, 2013. Implementation of the Municipality's LBO would cost $988,071 over the same period.

The Assembly voted on approval of the arbitrator's decision on August 30, 2011. Seven of eleven Assembly members voted to approve the arbitration decision — one vote short of the eight votes necessary for approval under the AMC.[27]

The Union held a meeting on the evening following the Assembly's vote and asked its members to vote to strike. Union employees approved the strike by a vote of 113-2. The strike was set to begin at 10:00 a.m. on September 2, 2011.

On September 1, 2011, the Municipality filed suit in Anchorage Superior Court to enjoin the planned strike. The Municipality asserted that Union employees

---

[26] The arbitrator selected the Municipality's LBO on the two other issues submitted to arbitration: 1) the termination of an existing program to pay supplemental payments to injured workers to ensure that, together with Workers' Compensation payments, such workers receive 80% of their regular pay; and 2) the termination of a 5% premium payment for field inspections. The arbitrator noted that the supplemental Workers' Compensation payments did not apply to the vast majority of union employees; and that the job description for affected union employees now included routine field inspections, thus rendering the premium payment superfluous.

[27] *See* AMC 03.70.110.C.10.b.

could not go on strike for more than 48 hours before the strike would pose serious risks to AWWU's facilities and the continued successful operation of its water and sewage systems; and that even a strike shorter than 48 hours could cause partial system failure if an unexpected event or breakdown occurred.

The Court held a hearing on the same day the Municipality filed suit. The Union agreed in advance of the hearing that the strike should be enjoined to protect the health, safety, and welfare of the public. The Court entered a preliminary injunction prohibiting Union employees from going on strike, with a specific provision that the parties had not waived any future argument as to the terms of a permanent injunction.

Following entry of the preliminary injunction, the Municipality filed an amended complaint for declaratory and injunctive relief. The Municipality requested a declaration from the Court that, under AMC 03.70.110.C.10.b, the arbitrator's decision is unenforceable, that the parties are at an impasse, and that the Municipality may implement its LBO. The Municipality further requested entry of a permanent injunction prohibiting the Union from striking.

The Union did not oppose the entry of a permanent injunction in its amended answer, but instead requested that the Court impose the arbitrator's decision on the parties as a condition of the permanent injunction.[28]

---

[28] In its original answer, the Union also brought counterclaims based on the implied covenant of good faith and fair dealing and substantive due process. The Union did not appear to raise these claims in its amended answer and did not pursue them in its briefing or at oral argument. Therefore the Court concludes that the Union has abandoned these claims.

APPENDIX

The parties fully briefed the issues and oral argument was held on November 9, 2011.

## III.    DISCUSSION

The parties agree that the Court should enter a permanent injunction. The Municipality contends that a strike by Union employees of any duration would immediately pose an unacceptable threat to the public health, safety, and welfare. The Union has consistently agreed with the Municipality on this point throughout the litigation. In addition, the Municipality and the Union agree that both parties have negotiated in good faith and otherwise met their obligations under the AMC's Employee Relations chapter. Therefore issuance of a permanent injunction is proper pursuant to AMC 03.70.110.B.[29]

Where the parties disagree is the effect that issuance of a permanent injunction has on the parties' rights and the collective bargaining process. The Union contends that if the right to strike under the AMC is taken away through entry of a permanent injunction, the Court should exercise its equitable power to substitute the right to binding arbitration and impose the interest arbitration award. The Municipality contends that the AMC does not allow an interest arbitration award affecting Class A.2 employees to be made binding on the parties in the absence of Assembly approval. The Municipality further contends that the Court should declare pursuant to AMC

---

[29]    The Court hereby incorporates the Findings of Fact and Conclusions of Law from the Preliminary Injunction Order entered September 1, 2011, to the extent that they are not inconsistent with this Order.

APPENDIX

03.70.110.C.10.b that the parties are at an impasse and that the Municipality may implement its LBO.

The Union's arguments raise two primary issues. The first issue is whether the Court may exercise its full equitable jurisdiction to decide the parties' bargaining dispute notwithstanding the strictures of the AMC. If the Court may not exercise its full equitable jurisdiction and must instead act within the bounds of the AMC, then the question becomes whether the AMC itself allows for the remedy that the Union seeks. The Union has not directly attacked the AMC provisions — it does not contend, for example, that those provisions are unconstitutional or otherwise infirm. Rather, the Union asserts that the relief it requests is consistent with the Court's equitable jurisdiction and is not repugnant to the AMC.

**A.     The Court's Equitable Jurisdiction Is Limited By The AMC.**

The Union contends that the Municipality invoked the Court's full equitable jurisdiction when it filed a complaint for injunctive relief, such that the Court may fashion whatever equitable remedy it deems just to resolve the parties' overall collective bargaining dispute. The Union principally relies on *Hecht Co. v. Bowles*[30] in support of its argument.

In *Hecht*, the United States Supreme Court held that the Emergency Price Control Act of 1942 did not remove courts' traditional equitable discretion in deciding whether to issue an injunction.[31] The Act stated that upon a showing that a person has

---

[30]     321 U.S. 321 (1944).

[31]     *Id.* at 328-29.

or is about to violate the Act, "a permanent or temporary injunction, restraining order, or other order shall be granted without bond."[32] The government argued that the language "shall be granted" made issuance of an injunction mandatory under the Act.[33] In rejecting this argument, the Court recognized the long history of the power of equity jurisdiction to craft each decree to the particulars of each case.[34] The Court concluded that there was no evidence of a clear and unequivocal intent by Congress to depart from this traditional equity practice when it enacted the Act.[35]

The Municipality counters that the Court's equitable jurisdiction is limited by the AMC. It relies on two principles of equity jurisdiction recognized by the Alaska Supreme Court in *Riddell v. Edwards*.[36] The first principle is that "a court acting in equity ordinarily cannot [intrude] in matters that are plain and fully covered by [a] statute."[37] A second and closely related principle is that "a court must not apply equity to do indirectly what the law or its clearly defined policy forbids to be done directly."[38]

---

[32]    *Id.* at 322.

[33]    *Id.* at 326-27.

[34]    *See id.* at 329-30.

[35]    *Id.* at 330.

[36]    76 P.3d 847 (Alaska 2003).

[37]    *Id.* at 854 (quoting *Pac. Scene, Inc. v. Penasquitos, Inc.*, 758 P.2d 1182, 1186 (Cal. 1988)) (internal quotation marks omitted).

[38]    *Id.* at 855 (quoting *Pac. Scene, Inc.*, 758 P.2d at 1186) (internal quotation marks omitted).

Put another way, "[c]ourts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law."[39]

Collective bargaining involving public employees is a highly regulated process. The AMC provides an explicit and comprehensive scheme governing collective bargaining between employee unions and the Municipality. It sets forth a step-by-step process for the resolution of outstanding issues in collective bargaining, with strict constraints and timelines. The AMC only allows the parties to involve the court in limited circumstances, such as when applying for an injunction prohibiting a strike by Class A.2 or A.3 employees,[40] or on appeal of an arbitrator's decision affecting Class A.1 employees.[41] Most importantly in the context of this case, the circumstances under which an arbitrator's decision may be made binding on the parties is fully covered by AMC 03.70.110.C.10.b. The AMC addresses impasses in the collective bargaining process and does not contemplate involvement of the courts beyond the finite circumstances outlined in the AMC.

This conclusion is buttressed by the fact that public employees do not have an inherent right to strike or an inherent right to binding arbitration.[42] Public employees

---

[39] *Hedges v. Dixon County*, 150 U.S. 182, 192 (1893).

[40] AMC 03.70.110.B.

[41] AMC 03.70.110.C.10.a.

[42] *See Anchorage Educ. Ass'n v. Anchorage Sch. Dist.*, 648 P.2d 993, 996-97 (Alaska 1982).

have those rights only where granted by legislative enactment.[43] The remedy the Union seeks, binding arbitration, is available only to the extent that it is granted by the AMC. The Court cannot issue an equitable decree vindicating the Union's rights on the one hand while acting outside the bounds of the very AMC that grants those rights on the other.

The Union's argument on this point is that the parties have reached the end of the process contemplated by the AMC and thus the code is no longer applicable. The Union contends that the AMC always guides the parties towards a resolution of their collective bargaining dispute, but that in this instance no resolution may be had because the Union's strike has been permanently enjoined. But while the AMC does aim for a final resolution of the parties' dispute, it does not mandate that a final resolution is necessarily achieved by this point in the process.

Provision 3.70.110.C.10.b provides that if the Assembly rejects the arbitrator's decision as to Class A.2 employees, as occurred here, then the parties are at an impasse, the Municipality may or may not implement its LBO, and the Union may choose whether to strike. Under this provision, there exist a number of scenarios where the parties' collective bargaining issue could be left unresolved after the Assembly votes to reject an arbitration award. The Union could choose not to strike at all. Or the Union could engage in an unsuccessful strike and return to work without concessions from the Municipality. Or, as happened in this case, the Union could choose to strike but the strike could be enjoined because of its impact on the public health, safety, and welfare. The end result is the same in each instance and is fully contemplated by the AMC: the

---

[43]     *Id.*

parties are left at an impasse, the Municipality may unilaterally implement its LBO, and the parties may return to the bargaining table once the conditions resulting in impasse have changed.[44]

The Court's conclusion does not run contrary to *Hecht Co. v. Bowles*. In *Hecht* the United States Supreme Court noted that the Emergency Price Control Act expressly stated that a "permanent or temporary injunction, restraining order, or other order shall be granted."[45] Because the entrance of orders other than an injunction or restraining order was permissible under the Act, the trial court acted within its equitable discretion in not granting an injunction and instead ordering the complaint dismissed.[46] This case is distinguishable from *Hecht* because the AMC only speaks to whether the Court should grant or withhold an injunction. The AMC does not allow for entry of "other orders" nor does it otherwise state or imply that the Court may broadly wield its equitable powers to settle the parties' overall dispute. The Court has the equitable power to grant the Union the relief it seeks only if that power can be found within the bounds of the AMC's Employee Relations chapter.

**B.  The AMC Does Not Allow The Court To Order Imposition Of The Interest Arbitration Award As A Consequence Of Enjoining A Strike By Class A.2 Employees.**

The Union proposes two primary rationales under which the Court may

---

[44]  *See generally* 48A AM. JUR. 2D *Labor and Labor Relations* § 2326 (2005) (discussing the consequences of a bargaining impasse under federal law).

[45]  *Hecht Co. v. Bowles*, 321 U.S. 321, 321 (1944).

[46]  *See id.*

order the interest arbitration award binding on the parties while honoring the framework of the AMC. First, the AMC requires the Court to consider the "total equities" when deciding whether or not to enjoin a strike by Class A.2 employees.[47] The Union argues that consideration of the "total equities" allows the Court to impose the interest arbitration award as a consequence of issuing a permanent injunction. Second, the Union contends that the AMC itself contemplates that all classes of Municipal employees should have either the right to binding arbitration or the right to strike, and that therefore the Court should substitute a right to binding arbitration when a class of employees' right to strike is "taken away" through the issuance of an injunction. The Union's arguments are examined in turn.

> **1.      In considering the "total equities," the Court may not go beyond the limited question of whether an injunction should be issued to prevent the strike.**

AMC 03.70.110.B provides that the Court may only enjoin a strike by Class A.2 employees if the strike has "begun to threaten the health, safety or welfare of the public." The AMC further counsels that "in deciding whether or not to enjoin the strike," the Court "shall consider the total equities in the particular class."[48] The AMC defines the term "total equities" as "includ[ing] not only the impact of the strike on the public but also the extent to which employee organizations and public employers have met their

---

[47]      AMC 03.70.110.B.

[48]      *Id.*

obligations under [the Employee Relations chapter]."[49]

The Union contends that consideration of the "total equities" allows the Court to impose whatever terms it deems equitable in issuing an injunction, including imposition of the interest arbitration award on the parties. The Municipality argues that the term "total equities" is more limited in its scope and that in any event, the Court may not rule contrary to AMC 03.70.110.C.10.b by imposing the interest arbitration award on the parties when the Assembly failed to approve it.

The term "total equities," taken on its own, might imply that the Court has broad powers in fashioning an equitable remedy when the Municipality applies for an injunction against a strike. But the term must be read within the context of AMC 03.70.110.B and the AMC's Employee Relations chapter in general. AMC 03.70.110.B states: "A court *in deciding whether or not to enjoin the strike* shall consider the total equities in the particular class" (emphasis added). Thus, the provision expressly limits consideration of the "total equities" to the context of whether the Court should enjoin the strike.

AMC 03.70.110.B also provides examples of what is included in the term "total equities." The AMC refers to "the impact of the strike on the public" and the extent to which the parties have met their obligations under the AMC. The term "total equities" contemplates a balancing act where, in determining whether to issue an injunction, the Court should weigh the impact the strike might have on the public health, safety, and welfare against the parties' conduct in the course of collective bargaining — including whether the parties took all of the necessary steps to resolve the dispute, such

---

[49] *Id.*

as mediation, fact-finding, and arbitration, and whether each party has bargained in good faith as required by the AMC. Conversely, the AMC does not list as examples factors the Court would logically consider if the Court were deciding whether to impose an arbitration award or an LBO, such as whether each side's LBO was "fair," or whether the arbitrator rendered a just decision.

Use of the term "total equities" does not open wide the doors of the Court's full equitable jurisdiction, but is instead limited to the discrete issue plainly stated in the ordinance: whether an injunction should be issued. Because the Union has not argued against an injunction but in fact agreed to it, the "total equities" provision is inapplicable to the current controversy.

Even if the term "total equities" did allow the Court to go beyond the finite issue of whether to issue an injunction, the Court still could not simply impose the interest arbitration decision as a complete resolution to the issue. AMC 03.70.110.C.10.b states that a supermajority of the Assembly must approve an interest arbitration decision before it may be binding on the parties.[50] In this case, the Assembly voted seven to four in favor of approval — one vote short of the necessary number to bind the Municipality to the terms of the arbitration award. The Court may not do through equity what it is prohibited from doing through law.[51] Thus the Court may not use equitable relief to render the arbitration award binding on the parties when the AMC requires Assembly approval and the Assembly instead chose to reject the award.

---

[50] AMC 03.70.110.C.10.b.

[51] *Riddell v. Edwards*, 76 P.3d 847, 855 (Alaska 2003).

APPENDIX

The Union disagrees, arguing that the Assembly did not "reject" the arbitration award so much as it simply failed to approve it. But under the facts and law of this case, that is a distinction without a difference. The Assembly voted on the question whether to approve the award, and the award garnered too few votes to be approved under the AMC. And AMC 03.70.110.C.10.b does not require that the award be "rejected." The section specifically provides that if the arbitrator's decision is not approved within 21 days of delivery of the arbitrator's decision or seven days of receipt of the internal auditor's financial analysis of the arbitration award, whichever is later, the parties shall be considered at an impasse, the Municipality may impose its LBO, and the Union may strike.[52]

Another problem with the Union's rejection rationale is that the applicable AMC provision once read as the Union now wishes to interpret it, but it has since been amended to its current form. In 1988 the Assembly approved a version of the AMC provision stating that arbitration decisions affecting Class A.2 and A.3 employees were binding unless rejected by a three to five majority of the Assembly. The Assembly then amended the provision one year later to provide that the arbitrator's decision is binding only if accepted by a supermajority of voters. Thus the Assembly evidenced a clear intent to make affirmative Assembly approval a necessary condition for the arbitrator's decision to be binding on the Municipality. For the Court to now impose the arbitrator's award despite the Assembly's failure to approve it by the necessary eight votes would run contrary to the 1989 amendments to AMC 03.70.110.

---

[52]    AMC 03.70.110.C.10.b.

APPENDIX

Consideration of the "total equities" as called for by AMC 03.70.110.B does not provide a vehicle for the Court to reach beyond the limited question of whether it should enjoin the strike. And even if the "total equities" provision did allow the Court to reach beyond that limited question, the Court could not use its equitable powers to impose the arbitration decision when the Assembly, in effect, rejected the same.

**2.      The AMC does not express a general policy that every class of Municipal employees must have either an unlimited right to strike or a right to binding arbitration.**

The Union's second argument is that the AMC grants each class of employees either the right to strike or the right to binding arbitration, and thus when the Court "takes away" the Union's right to strike by entering an injunction it must substitute a right to binding arbitration as quid pro quo.

At the outset, the Court notes an inconsistency with the Union's assertion that the Court has "taken away" the Union's right to strike by granting an injunction: the Union has in fact not opposed the issuance of an injunction. The Union could conceivably have pushed to strike for a "limited" period of time as contemplated by the AMC, but chose not to pursue that possibility. Nonetheless, the Court recognizes that the Union acted in good faith and responsibly in not pushing the limits of the "health, safety and welfare of the public," and thus will proceed as though an actual controversy exists notwithstanding the Union's non-opposition.

Turning to the Union's argument, the Union asserts that a public policy in favor of granting the Union either an unlimited right to strike or the right to binding arbitration can be found in the stated policy underlying the AMC's Employee Relations chapter.

APPENDIX

The stated policy of the AMC's Employee Relations chapter is "to promote harmonious and cooperative relations between the municipality and its employees and to protect the public by ensuring orderly and effective operations of government."[53] The Union argues that when there is a breakdown in the collective bargaining agreement, harmonious and cooperative relations can only be achieved by giving each party an "economic weapon" that it may use against the other. In the Union's case, this weapon is either the right to strike or the right to binding arbitration; in the Municipality's case it is the option to unilaterally implement its LBO.

The Union also points to Justice Rabinowitz's dissent in *Anchorage Education Association v. Anchorage School District* (*AEA*)[54] in support of its argument that public employees are generally given either the right to strike or the right to binding arbitration. *AEA* dealt with an illegal strike attempt by public school teachers. Under the version of the Alaska Public Employment Relations Act (PERA) in place at the time, teachers presumably would have belonged among a class of public employees who were granted a limited right to strike. However, the definitions section of PERA excluded "teachers" from the definition of "public employees" under the Act, meaning that the teachers did not have even a limited right to strike by statute.[55] In addition to this lack

---

[53]    AMC 03.70.020.A.

[54]    648 P.2d 993 (Alaska 1982).

[55]    *See id.* at 995.

of a statutory right to strike, the Court examined the common law and determined that teachers did not have an inherent right to strike.[56]

In response, the teachers noted that other public employees had either the right to strike or the right to binding arbitration. The teachers argued that if they did not have a right to strike then they must have a right to binding arbitration, or else they would be denied equal protection of the law.[57] The Court rejected this argument.

The Court first found that the legislature's decision to exclude teachers from PERA bore a fair and substantial relationship to the purpose of PERA, which is to "promote harmonious and cooperative relations between government and its employees and to protect the public by assuring effective and orderly operations of government."[58] The teachers argued that this purpose would be frustrated by the absence of a right to strike or right to binding arbitration because those rights are necessary to discourage bad faith negotiating by employers. The Court disagreed, stating that "[w]hile it is true that binding arbitration rights may give the teachers greater bargaining leverage, we cannot say that it is required as a means of ensuring cooperative relations."[59] In addition, the Court noted that neither a right to strike nor a right to binding arbitration was necessary

---

[56]     *Id.* at 995-96.

[57]     *See id.* at 996-97.

[58]     *Id.* at 997 (quoting AS 23.40.070).

[59]     *Id.*

to satisfy PERA's purpose because, under Alaska law, the teachers' public employers were required to negotiate in good faith.[60]

The Court then turned to the legislature's decision to withhold from teachers the right to binding arbitration that PERA afforded to other employees who were not granted a right to strike. The Court stated: "It is permissible for the legislature to have found that teachers, although necessary to the functioning of society so as to forbid strikes, were not so essential as to require compulsory arbitration."[61] Thus the Court determined that withholding both the right to strike and the right to binding arbitration was substantially related to the legislature's goal of uninterrupted school operation.[62]

Justice Rabinowitz dissented from the Court's opinion on the issue of equal protection. In Justice Rabinowitz's view, the complete exclusion of teachers from the strike and arbitration provisions of PERA was not substantially related to the purposes of that Act.[63] Justice Rabinowitz noted that PERA's primary purpose was "to provide rational and effective guidelines for public employment relations" — a purpose substantially similar to that embodied in AMC 03.70.020.A. Justice Rabinowitz explained that PERA furthered this purpose by balancing the employees' need for effective means of bargaining with the state's need to maintain uninterrupted services in

---

[60]    *See id.* (citing former AS 14.20.550).

[61]    *Id.*

[62]    *Id.*

[63]    *Id.* at 998-99 (Rabinowitz, J., dissenting).

certain essential governmental operations.[64] Thus PERA placed employees into three categories: "non-critical" employees who were given a general right to strike; "semi-critical" employees who were allowed a limited right to strike; and "critical" employees who were denied any right to strike but were given the right to binding arbitration in return.[65]

Justice Rabinowitz explained that the legislature's choice to exclude teachers from any of the foregoing three classes was not substantially related to PERA's purpose because:

> Under PERA the category of 'critical' employees was granted the right to binding arbitration to compensate for the total denial of a right to strike. In essence the legislature realized that while a ban on strikes for 'critical' public employees was necessary, such a ban placed these employees in a disadvantageous bargaining position. Therefore, in the interest of fair and meaningful negotiations these employees were given the right to binding arbitration. . . . Viewed in this perspective, the denial of binding arbitration to teachers, coupled with the ban on strikes seems at odds rather than 'substantially related' to the purposes of PERA in that it significantly handicaps public school teachers in their collective bargaining efforts.[66]

---

[64]    *Id.* at 998.

[65]    *Id.*

[66]    *Id.* at 999.

Thus, Justice Rabinowitz would have held that PERA violated the equal protection clause by completely excluding teachers from the strike and arbitration provisions of PERA.[67]

The Union essentially argues that the Assembly adopted this theory in drafting its Employee Relations chapter. As the argument goes, the Assembly intended that each group of employees would have a weapon that they could use against the Municipality in the event that collective bargaining negotiations were not fruitful: they could either go on strike, or they could force the issue to binding arbitration. If the Union's right to strike is enjoined, the Union argues, then they must have the right to binding arbitration substituted in its place. Otherwise, Union employees would end up in a situation not contemplated by the AMC where they have neither the right to strike nor the right to binding arbitration. And because the Municipality retains the option to implement its LBO, the balance of power would be shifted toward the Municipality in a manner not contemplated by the AMC.

The Union's argument is not persuasive for several reasons. Beginning with the Union's reliance on the AMC's statement of policy, the Supreme Court held in *AEA* that granting either the right to strike or the right to binding arbitration was not necessary to vindicate the policy statement in PERA, which was substantially similar to the AMC policy statement.[68] Although the Court dealt with an equal protection claim in *AEA*, the rationale applies with equal force to an argument that AMC 03.70.20

---

[67]    *Id.*

[68]    *See id.* at 997 (majority opinion).

somehow mandates that all non-exempt Municipal employees must have either a right to strike or a right to binding arbitration. This is especially true in light of the fact that the teachers in *AEA* had no right to strike whatsoever, whereas the Union is granted a limited right to strike under the AMC.[69] If the State could satisfy the purposes of PERA while withholding from teachers even a limited right to strike, then the AMC certainly may satisfy its similarly stated purpose by granting a limited right to strike to Union employees. In addition, as in *AEA*, the Union is still protected by the Municipality's duty to bargain in good faith.[70]

Turning to his dissenting opinion in *AEA*, Justice Rabinowitz's views were not accepted by the majority of the Court and therefore hold limited persuasive value in the instant case. Moreover, even Justice Rabinowitz did not go so far as the Union is now asking this Court to go. Justice Rabinowitz was concerned with the complete exclusion of teachers from any class of employees under PERA.[71] Unlike the Union employees in this case, the teachers in *AEA* were not given even a limited right to strike. In fact, Justice Rabinowitz specifically wrote that, in his view, the State would not have

---

[69]     *See* AMC 03.70.110.B.

[70]     *See* AMC 03.70.010, .020.A, 070.B, & .140.A.5.

[71]     *See AEA*, 648 P.2d at 998-99 (Rabinowitz, J., dissenting) (stating "the question which must be answered is whether the exclusion of public school teachers from any of [PERA's three classes of employees] is reasonable in light of the purposes of PERA").

violated the equal protection clause if it had given the teachers the same limited right to strike that Union employees have in this case.[72]

The Union contends that the instant case is distinguishable from *AEA* because the Assembly granted the Union a limited right to strike, whereas in *AEA* the legislature granted teachers neither a right to strike nor a right to binding arbitration. In the Union's view, the fact that the Assembly granted a limited right to strike means that the Assembly must have believed that the Union would and should have a right to binding arbitration when the limits of their right to strike were reached. But the Union cites no authority for that assertion, it ignores overwhelming authority to the contrary, and it conflicts with the express language of the AMC.

The AMC repeatedly refers to the limited nature of the right to strike enjoyed by Class A.2 employees. The services of Class A.2 employees are defined as those that "may be interrupted for a limited period but not . . . indefinite period of time."[73] AMC 03.70.110.B states that Class A.2 employees may engage in a strike only "for a limited time"; that "[t]he limit" of Class A.2 employees' right to strike "is determined by the interests of the health, safety and welfare of the public"; and that the strike may be enjoined if it has begun to threaten those interests.

The AMC juxtaposes this limited right to strike on the part of Class A.2 employees with the more extensive right to strike enjoyed by Class A.3 employees.

---

[72] *See id.* at 999 ("On the other hand, if teachers are not as essential as the 'critical' employees then they should enjoy the same limited strike rights given to other 'semi-critical' public employees.").

[73] AMC 03.70.110.A.2.

Work stoppages involving Class A.3 employees "may be sustained for extended periods" absent "extraordinary circumstances."[74]  And a strike by Class A.3 employees may only be enjoined in "extraordinary circumstances [threatening] the health, safety or welfare of the public."[75]

Despite granting Class A.2 employees a more limited right to strike than that enjoyed by other Municipal employees, the AMC does not substitute a right to binding arbitration when the limits of Class A.2 employees' right to strike have been reached and an injunction has issued against them.  Given that there is no inherent right to strike or right to arbitration except those which are granted by legislative acts,[76] this absence of a substituted right to arbitration must be interpreted as a decision by the Assembly to affirmatively deny Class A.2 employees that right.

That the Assembly affirmatively chose not to substitute a right to arbitration when an injunction is issued against a strike by Class A.2 employees is even clearer when comparing the AMC scheme to Alaska's state statutes.  Like the AMC, the PERA divides employees into three separate classes.[77]  Also similar to the AMC, Class A.2 state employees' right to strike is "limited" by the interests of the health, safety, or welfare of the public, and the public employer may apply to the superior court to enjoin the strike

---

[74]     AMC 03.70.110.A.3.

[75]     AMC 03.70.110.B.

[76]     *See Anchorage Educ. Ass'n v. Anchorage Sch. Dist.*, 648 P.2d 993, 995-97 (Alaska 1982).

[77]     *See* AS 23.40.200(a).

when these interests are threatened.[78] The state statute goes on to say: "If an impasse or deadlock still exists after the issuance of an injunction, the parties shall submit to arbitration."[79] The AMC mandates non-binding interest arbitration before a strike may be held but does not contain a similar provision allowing for binding arbitration as a consequence of an injunction prohibiting a strike.

It is permissible for the Assembly to have concluded that Class A.2 employees are essential enough that their right to strike should be limited, but not so essential that they must be given the right to binding arbitration enjoyed by Class A.1 employees.[80] Faced with the choice of completely withholding from Class A.2 employees any right to strike whatsoever or granting a limited right to strike that might not be particularly useful, the Assembly chose the latter option. The Union wants to make this limited right in to something more than it is. The premise of the Union's equitable argument is logically sound, the Court may assume that it is accurate, and the Court is sympathetic to their plight, that as Class A.2 employees, they have less bargaining leverage than either Class A.1 or A.3 employees. But that is the position that the Assembly lawfully chose for them.

The Union argues that the Court should superimpose upon the AMC either an unlimited right to strike or a right to binding arbitration for all public employees. But

---

[78]   AS 23.40.200(c).

[79]   *Id.*

[80]   *Cf. AEA*, 648 P.2d at 997 ("It is permissible for the legislature to have found that teachers, although necessary to the functioning of society so as to forbid strikes, were not so essential as to require compulsory arbitration.").

the Court cannot override the policy choices of the people's elected representatives in this manner. Such a maneuver by the Court "would be an action . . . tipping the social balance in [the Municipality's] labor relations."[81] This balance is set by the Assembly. If the Union is to achieve a more favorable status for itself than it currently enjoys under the AMC, it must do so through the political process, not the Courts.

## IV. CONCLUSION

The Municipality's Motion for Declaratory Judgment and Injunctive Relief is GRANTED.

The Union shall be permanently enjoined from going on strike through the end of the current collective bargaining period in June 2013. Pursuant to AMC 03.70.110.C.10.b, the interest arbitration award is advisory only and cannot be imposed on the bargaining parties; the parties are at an impasse; and the Municipality may implement its LBO.

Dated: February 10, 2012
/s/ _Alex M. Swiderski_
Superior Court Judge, Pro Tem

---

[81] *See id.* at 996.